Stanley L. Goodman (SG/7179)
Brian A. Caufield (BC/5673)
FOX ROTHSCHILD LLP
Formed in the Commonwealth of Pennsylvania
75 Eisenhower Parkway, Suite 200
Roseland, New Jersey 07068
Attorneys for Respondent
Renaissance Equity Holdings, LLC, *et al.*
(973) 992-4800 (p); (973) 992-9125 (f)
bcaufield@foxrothschild.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES G. PAULSEN, Regional Director of Region 29 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, <br><br> Petitioner, <br><br> v. <br><br> RENAISSANCE EQUITY HOLDINGS, LLC, RENAISSANCE EQUITY HOLDINGS, LLCs A through G, d/b/a Flatbush Gardens, <br><br> Respondents. | Civil Action No. 12-CV-350 <br><br> **(Document Electronically Filed)** |

**RESPONDENTS' MEMORANDUM OF LAW IN OPPOSITION**
**TO PETITION FOR TEMPORARY INJUNCTION**

RL1 987218v2

## TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE ARGUMENT ................................................................ 1

II.   STATEMENT OF THE CASE ................................................................... 10

III.  STATEMENT OF THE FACTS .................................................................. 10

    a.    The parties, property, employees, and bargaining relationship. ........................... 10

    b.    Renaissance's financial condition going into negotiations with the Union. .......... 12

    c.    The Union's negotiators acknowledged that Renaissance was experiencing multimillion dollar losses each year after receiveing a Statement of Operations and reviewing Renaissance's financial books and records on two separate occasions. ................................................................... 13

        i.    *The Mayer Rispler Report* ................................................................ 13

            1)    Rental income. ............................................................................. 13

            2)    Repairs, maintenance and supplies. ............................................... 14

            3)    Gunki's sale of the Williamsburg property ..................................... 15

        ii.   *The Union reviewed Renaissance's financial books and records on two separate occasions and acknowledged Renaissance's losses during negotiations.* ................................................................... 16

    d.    Renaissance presented the Union with its Last, Best and Final Proposal ............. 19

    e.    Renaissance's right to subcontract ................................................................ 21

    f.    The Lockout. ................................................................................................ 25

IV.   ANALYSIS ............................................................................................. 25

    a.    This Court should defer to Judge Fish's preliminary opinion that the Region's surface bargaining case is weak and full of holes, and find that there is no reasonalble cause to believe Renaissance engaged in surface bargaining. ................................................................................................ 26

i

    i.    *The Bargaining*. .................................................................27

    ii.   *The Financial Information and Copies*. .............................29

    iii.  *The Healthcare, Safe and Healty Workplace, and "Off the Record"*
          *Proposals*. ...................................................................31

  b.  Judge Fish expressed doubt that Renaissance ever insisted that the Union
      ratify the agreement and, therefore, it cannot be said that there is
      reasonable cause to believe that the lockout was unlawful....................33

  c.  Renaissance had a contractual right to subcontract and, even assuming that
      it did not, the Union did not request bargaining or file a grievance, nor did
      any bargaining unit employee suffer any detriment from Renaissance's
      increases in subcontractors. ...................................................35

  d.  The requested relief is not just and proper.................................36

    i.    *Support and the collective bargaining process*. ..........................37

    ii.   *Irreparable harm to the employees*. ....................................39

    iii.  *Harm to Renaissance and its replacement employees.*. ..............41

    iv.   *Passage of time*. ..........................................................41

V.  **CONCLUSION** .........................................................................42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>CASES</u>

*Asseo v. Pan Am. Grain Co., Inc.,*
805 F.2d 23 (1st Cir. 1986)........................................................................37

*Atlanta Hilton & Tower,*
271 N.L.R.B. 1600 (1984) .........................................................................26

*Bloedorn v. Francisco Foods, Inc.,*
276 F.3d 270 (7th Cir. 2001) .....................................................................37

*Blyer v. Unitron Color Graphics of New York, Inc.,*
1998 WL 1032625 (E.D.N.Y. 1998).......................................................2, 41

*Brink's USA,*
354 N.L.R.B. 41 (2009) .............................................................................31

*Challenge-Cook Bros.,*
288 N.L.R.B. 387 (1988) ...........................................................................31

*Frankl v. HTH Corp.,*
650 F.3d 1334 (9th Cir. 2011) ...................................................................37

*Hoffman v. Inn Credible Caterers, Ltd.,*
247 F.3d 360 (2d Cir. 2001)................................................................2, 3, 26

*Houston Cty. Elec. Coop.,*
285 N.L.R.B. 1213 (1987) .........................................................................27

*Kaynard v. Lawrence Rigging, Inc.,*
1972 WL 803 (E.D.N.Y. 1972)...................................................................41

*Kaynard v. Mego Corp.,*
633 F.2d 1026 (2d Cir. 1980)...........................................................26, 36, 41

*Kaynard v. Palby Lingerie, Inc.,*
625 F.2d 1047 (2d Cir. 1980)................................................................2, 3, 26

*Kobell v. Beverly Health and Rehab. Srvcs., Inc.,*
987 F. Supp. 409 (W.D. Pa. 1997)..............................................................37

*Kobell v. Suburban Lines,*
731 F.2d 1076 (3rd Cir. 1984) ...................................................................38

*Latrobe Steel Co. v. NLRB,*
    630 F.2d 171 (3rd Cir. 1980) ...................................................................33

*Louisiana-Pacific Corp.,*
    312 N.L.R.B. 165 (1993) .........................................................................35

*McLeod v. Business Machine and Office Appliance Mechanics Conf. Board,*
    300 F.2d 237 (2d Cir. 1962) ...................................................................26

*McLeod v. General Elec. Co.,*
    366 F.2d 847 (2d Cir. 1966) ..........................................................1, 26, 36

*McLeod v. General Elec. Co.,*
    385 U.S. 533 (1967) ...............................................................................36

*Moore-Duncan v. Horizon House Dev. Services.,*
    155 F. Supp.2d 390 (E.D. Pa 2001) ...................................................37, 38

*Morio v. North Am. Soccer League,*
    632 F.2d 217 (2d Cir. 1980) ...................................................................37

*Overnite Transportation Co.,*
    296 N.L.R.B. 669 (1989) .........................................................................26

*Paccar, Inc.,*
    357 N.L.R.B. No. 13 (2011) ....................................................................30

*Pascarell v. Vibra Screw,*
    904 F.2d 874 (3rd Cir. 1990) .................................................................38

*Pleasantville Nursing Home,*
    335 N.L.R.B. 961 (2001) .......................................................................8, 33

*Public Service Co. of Oklahoma*
    *(PSO),* 334 N.L.R.B. 487 (2001) ..........................................................26

*Scott v. Stephen Dunn & Assocs.,*
    241 F.3d 652 (9th Cir. 2001) .................................................................37

*Seeler v. Trading Port, Inc.,*
    517 F.2d 33 (2d Cir. 1975) .....................................................................36

*Sharp v. Parents in Cmty. Action,*
    172 F.2d 1034 (8th Cir. 1999) ..............................................................1, 41

*Silverman v. 40-41 Realty Assocs., Inc.,*
    668 F.2d 678 (2d Cir. 1982) ...................................................................36

*Silverman v. Major League Baseball Player Relations Comm.*,
    67 F.3d 1054 (2d Cir. 1995)..................................................................................26

*Stella D'oro Biscuit Co., Inc.*,
    355 N.L.R.B. No. 158 (2010) ...........................................................................30

*Telescope Casual Furniture*,
    326 N.L.R.B. 588 (1998) ..................................................................................31

*Union Carbide Corp.*,
    165 N.L.R.B. 254 (1967) ..............................................................................8-9, 33

*Westinghouse Electric Corp.*,
    153 N.L.R.B. 443 (1965) ..................................................................................35


**STATUTES**

29 U.S.C. § 160(j) (West 2012) .................................................................... *passim*

§2807-k(9-a) of the New York Public Health Law. ...............................................40


**OTHER AUTHORITIES**

General Counsel Memorandum 02-07 (August 9, 2002)...........................................1

http://hospitals.nyhealth.gov/psa............................................................................40

http://labor.ny.gov/stats/pressreleases/pruistat.shtm.............................................40

## I.    SUMMARY OF THE ARGUMENT[1]

Injunctive relief is not warranted here.    Renaissance Equity Holdings, LLC and Renaissance Equity Holdings, LLCs A through G, d/b/a Flatbush Gardens ("Renaissance") has offered to reinstate the locked out employees, subject to the Administrative Law Judge's decision now pending, at wages, benefits and certain terms that were set forth in Renaissance's Last Best and Final Proposal ("Final Offer) submitted to Service Employees International Union, Local 32BJ ("Union" or "Local 32BJ") on September 1, 2010.    Thus, should Petitioner accept Renaissance's offer, there will be no need for injunctive relief. *See* Exhibit A.

In the event Petitioner does not accept Renaissance's offer, injunctive relief pursuant to Section 10(j) of the National Labor Relations Act ("Act"), 29 U.S.C. § 160(j) (West 2012), is not appropriate because it represents an "extraordinary remedy" to be used only in the limited circumstance where "the remedial purpose of the Act would be frustrated unless immediate action [is] taken." *McLeod v. General Elec. Co.*, 366 F.2d  847, 849 (2d Cir. 1966), *vacated as moot*, 385 U.S. 533 (1967); *Sharp v. Parents in Cmty. Action*, 172 F.2d 1034, 1038 (8th Cir. 1999).    Indeed, even under the National Labor Relations Board's ("NLRB", "Board" or "Petitioner") own internal memorandum, Section 10(j) relief is treated as an unusual and extreme remedy only to be pursued where there is a clear showing that an ultimate Board order will be ineffective to remedy the alleged unfair labor practices. *See*, General Counsel Memorandum 02-07 (August 9, 2002); *see also* S.  Rep.  No.  105, 80th Cong. 1st Sess at p. 27, I, Legislative History of the Labor Management Relations Act of 1947, at p. 433 (purpose of enacting Section

---

[1]  Respondents moved to dismiss the Petition for lack of subject matter jurisdiction.  Should the Court deem the motion to be procedurally defective in anyway, the argument fully set forth in the motion papers shall be deemed incorporated herein, as an affirmative defense to the Petition.

RL1 987218v2

10(j) was to provide interim relief in cases where circumstances "make it impossible or not feasible to restore or preserve the status quo" by or pending the final Board order).

To be entitled to such extraordinary relief, the Board must establish (1) that there is "reasonable cause to believe that unfair labor practices have been committed" and (2) that the requested relief is "just and proper." *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 365 (2d Cir. 2001); *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir. 1980). Further, in this case—considering the long delay in seeking injunctive relief—Renaissance requests that this Court require the posting of a bond as a condition of the issuance of an injunction so that Renaissance, in the even it prevails in the administrative matter, can recoup the difference between the wages and benefits the proposed order seeks versus what it is currently paying employees. *See, Blyer v. Unitron Color Graphics of New York, Inc.*, 1998 WL 1032625 (E.D.N.Y. 1998) (requiring the posting of a bond pending the final disposition of the administrative matters).

Renaissance owns 59 apartment buildings with 2,500 apartments in East Flatbush, Brooklyn. Many of the apartments are best characterized as rent stabilized and/low-income housing and, until somewhat recently, many of the apartments were used to shelter the homeless. At all times relevant herein, Renaissance employed roughly 70 employees ("bargaining unit employees" or "union employees") who were represented by the Union to perform handyman and porter services at the apartment buildings. Significantly, these bargaining unit employees received the same wages and benefits as handymen and porters who work in residential buildings on Park Avenue in Manhattan.

Region 29 of the National Labor Relations Board ("Region"), the Union, and Renaissance participated in 12 days of hearing before Administrative Law Judge Stephen Fish

("Judge Fish"). The crux of the Region's case against Renaissance was that even though Renaissance was losing millions of dollars every year—and the Union repeatedly acknowledged Renaissance's losses—Renaissance's refusal to agree to Local 32BJ's proposal that Renaissance once again **increase** its wages and benefits in accordance with Local 32BJ's residential industry-wide agreement with the Realty Advisory Board on Labor Relations ("RAB Agreement") constitutes bad faith bargaining. Specifically, the Region claimed that Renaissance deliberately refused to reach a new labor agreement with 32BJ (commonly referred to as "surface bargaining"), and that but for Renaissance's bad faith bargaining, the lockout of the bargaining unit employees could have been avoided.

According to Judge Fish, this case, at its core, is one of whether surface bargaining occurred and whether Flatbush Gardens illegally insisted on acceptance of ratification—a permissive subject—as a condition to avert or end the lockout. Judge Fish stated that the other issues in the case were "minor". (Tr. 2431).[2] Indeed, Judge Fish's comments at the end of the hearing, make it abundantly clear that the Board cannot establish that: (1) there is "reasonable cause to believe that unfair labor practices have been committed", and (2) that the requested relief is "just and proper." *Inn Credible Caterers*, 247 F.3d at 365; *Palby Lingerie*, 625 F.2d at 1051. Specifically, Judge Fish made it clear that the Region's surface bargaining case is **"problematic"** and one with **"a lot of holes in it."** Tr. 2428 (emphasis added). As to ratification, Judge Fish stated that "there is **doubt in [his] mind** . . . whether in this case the evidence establishes **that . . . [Flatbush Gardens] . . . has insisted on that subject** (*i.e.*; ratification) as a condition of agreement . . . and whether it automatically taints the lockout . . .." Tr. 2430 (emphasis added).

---

[2] Citations to the record of the administrative hearing are as follows: the Transcript = Tr.; the Joint Exhibits = JTX; the Region's Exhibit = GCX; Renaissance's Exhibit = RX; and, the Union's Exhibit = CPX.

At the outset, the Court should note that the Union never raised a single objection to Renaissance's conduct during the course of the bargaining, and flatly rejected Renaissance's proposal that the parties sign an agreement that simply reduced the size of the bargaining unit to help Renaissance curb the multimillion dollar losses it was suffering every year. At the "off-the-record" meeting, the Union had suggested that Renaissance make a settlement proposal that reduced the size of the bargaining unit below the than agreed-upon 70 employees. Renaissance made such a proposal immediately following the "off-the-record" meeting. The proposal also proposed payment of severance pay to those employees who would lose their positions or chose not to accept positions. The Union received the proposal it had solicited, but did not make a counter proposal as to the number of unit employees or the amount of severance pay. In fact, the Union's representative told Renaissance's lead negotiator that the Union would rather have a protracted legal fight with Renaissance, rather than agree to any contract that did not contain the wage and benefit increases the Union was demanding. (Tr. 1258-60).

Now, more than 14 months after Renaissance commenced the lockout and underlying unfair labor practices were filed, the Board asks the Court to order Renaissance to reinstate the locked out bargaining unit employees on the ground that a Board Order in its case against Renaissance would have little value. Passing for the moment, the point that the Board waited more 14 months to request the injunctive relief—which dispels any inference that the bargaining unit employees are suffering irreparable harm—the Board fails to advise the Court of three key undisputed facts adduced at the hearing, which are fatal to the Board's instant petition. Indeed, the undisputed facts below reveal that the Union—not Renaissance—engaged in bad faith bargaining by insisting that Renaissance agree to wage and benefit **increases**, even though the

4

Union acknowledged that Renaissance could not afford the increases based on its multimillion dollar operational losses.

More specifically:

### Undisputed Fact #1:

**Renaissance has been operating at multimillion dollar losses since its first purchased the property roughly six years ago, and it proposed to reduce the bargaining unit employees' wages and benefits to help curb the losses.**

During the parties' hearing, George Reis, the Union's former Director of Finance and Administration (a certified public accountant who reviewed Renaissance's financial books and records on two separate occasions), an expert forensic accounting witness the Union hired (at $450/hour) to review Renaissance's financial documents, and each of the Union's three attorneys who appeared as the lead negotiators during bargaining, **all agreed that Renaissance was losing millions of dollars every year**. In fact, Ron Raab, Esq., the Union's lead negotiator for the parties' final seven bargaining sessions, delivered a prepared written speech at the bargaining table during the first negotiation session he attended and expressly acknowledged that Renaissance had an economic problem, and that the parties needed to find a solution to fix the problem. Moreover, Renaissance fully disclosed to the Union the $28 million dollar sale through the general ledgers, tax returns and balance sheets that it provided to the Union during Reis' review.

### Undisputed Fact #2:

**Renaissance was an independent employer, and was not bound to any "industry agreements" that 32BJ negotiated with other employers.**

5

The Union delayed bargaining with Renaissance for months—January 5, 2010 to June 15, 2010[3]—despite Renaissance's insistence that it wanted to commence bargaining, and Renaissance expressly stating that it was losing money and may not survive. As the Union admits, it had other priorities which took precedent over negotiating a new agreement with Renaissance; namely, the Union was negotiating a successor residential RAB Agreement. It was only after the Union finalized the RAB Agreement, and Renaissance threatened to file unfair labor practice charges against the Union, that the Union finally agreed to meet with Renaissance to commence bargaining. The Union admits that it waited until its negotiations with the RAB were concluded so that it would know the exact amount of the wage and benefit increases it was going to ask Renaissance to pay. However, it is indisputable that Renaissance was not a member of the RAB, and had the legal right to negotiate with the Union as an "independent employer". Meaning, Renaissance sought to bargain as an individual entity, and reach an agreement that reflected the viability of its individual operations and financial condition, as opposed to the operations and economic conditions of a larger group of primarily Manhattan based employers.

### Undisputed Fact #3:

**Despite acknowledging Renaissance's losses, the Union demanded that Renaissance agree to the wage and benefit increases contained in the RAB Agreement, and never once moved off of this position.**

Remarkably, even though the Union acknowledged Renaissance was hemorrhaging millions of dollars per year, the Union refused to bargain with Renaissance as an independent employer and, instead, insisted that Renaissance increase the wage and benefit amounts it paid for its 70 bargaining unit employees, consistent with the increases in the RAB Agreement. Those increases would have translated into significant, increased operating costs for

---

[3] Unless otherwise noted, all dates hereinafter are in 2010.

Renaissance, which would have further exacerbated its current multimillion dollar operating losses. The Union also admitted that it wanted the increases because the RAB Agreement contained a "Most Favored Nations Clause", which authorized the RAB member employers to implement any more favorable terms the Union might reach with independent employers.

More pointedly, at the bargaining table, Raab told Renaissance that the Union was not going to sacrifice 25,000 members to save the 70 bargaining unit employees at Renaissance, and that in his experience, the "ship never goes down." Meaning, the Union was not going to agree to wage cuts for Renaissance's 70 bargaining unit employees because it did not want to take a chance that the RAB member employers would implement similar wage cuts, and that if Renaissance collapsed because it could not afford the increases, some other company would buy the property and hire the 70 Union employees.

Needless to say, Renaissance took little comfort in this, and asked for individual consideration on the grounds that it was an independent employer (and not a member of the RAB) and needed an economic package that would help fix its struggling operations. However, the Union continually insisted that Renaissance **increase** its operating costs, and unapologetically explained that it would never accept any agreement that lowered the wages and/or benefits of the 70 employees because it could "break the back of the industry".

This deadlock between the Union and Renaissance is the unfiltered, and undisputed, reason why they did not reach a successor agreement. The Region's allegations concerning Renaissance's surface bargaining are a red-herring. Indeed, it did not matter what Renaissance did—lawfully or unlawfully—because the Union was never going to agree to anything less than the wage and benefit increases in the RAB Agreement, and Renaissance could not afford those increases. The Union's decision to protect its institutional interests (*i.e.*, to preserve the integrity

of a most favored nations clause) is certainly understandable, but it is completely disingenuous for the Board to now assert that *but for* Renaissance's alleged conduct during negotiations, the parties would have reached a deal that avoided a lockout.

Respectfully, this entire application is a farce, inasmuch as Local 32BJ made a conscious decision to ignore Renaissance's pleas for cost savings, and the Union maintained a "take or leave it" stance with respect to the RAB Agreement. Further, Renaissance commenced the lockout after the Union's repeated threats of a strike, starting with a letter from the President of the Union in April through the Union's negotiators' statements in October.

The Board argues that Renaissance unlawfully included the term *ratification* in its Final Offer and lockout notice, and notified the Union that bargaining unit employees could not return to work until they ratified a new labor agreement. The Board further argues that "employee ratification" is a permissive subject of bargaining, and that by merely inserting the term "ratification" into the Final Offer and lockout notice, Renaissance violated the bargaining unit employees' Section 7 rights, and tainted an otherwise lawful lockout. Significantly, the Board fails to advise the Court that during the hearing, the Union and Region stipulated that the Union never even mentioned or questioned the ratification proposal after it was made on September 1. Based on this fact alone, the Board's entire "ratification argument" must be rejected as a matter of law.

Indeed, it is well-recognized that employee ratification of a collective bargaining agreement is not *per se* unlawful or inherently destructive of employees' Section 7 rights. Moreover, an employer can request that the bargaining unit employees ratify the collective bargaining agreement. It is only when the employer insists "'in the face of a clear and express refusal'" by the union to bargain about the permissive subject (i.e., ratification) that the employer

runs afoul of the law.  *See, Pleasantville Nursing Home*, 335 N.L.R.B. 961, 964 (2001).  Absent "a clear and express refusal" by the union to bargain about the permissive subject, an employer's inclusion of that subject in its final offer **does not constitute unlawful insistence**.  *Union Carbide Corp.*, 165 N.L.R.B. 254, 255 (1967), affd. sub nom. *Oil, Chemical and Atomic Workers Local 3-89 v. NLRB*, 405 F.2d 1111 (D.C. Cir. 1968) (dismissing complaint allegations that employer unlawfully insisted upon permissive subject where union did not oppose the subject until the employer included the proposal in its final offer, four weeks after the proposal was first presented).  Since the record is devoid of any evidence, and Petitioner's brief is devoid of any citations to the record at hearing, showing Renaissance **affirmatively insisted** (versus merely suggested) that bargaining unit employees ratify the Final Offer, **after a clear and express refusal by the Union to bargain about ratification**, this entire allegation is clearly defective as a matter of law.

More importantly, this entire issue is another smoke screen.  The Union repeatedly stated that it was never going to accept any agreement that did not contain the wage and benefit increases set forth in the RAB Agreement, irrespective of what method of acceptance Renaissance suggested.  Put differently, had the Union held a *bona fide* concern about the Final Offer having to be ratified and/or its members being locked out as a result of the ratification requirement, one would reasonably expect—at a minimum—the Union would have raised the issue with Renaissance.  Instead, it sat silent, and conjured up this argument months after it filed its amended unfair labor practice charge.  In fact, Judge Fish specifically questioned the Union on this point at the hearing to understand why the Union did not raise the issue with Renaissance during bargaining.  Naturally, the Union had no response.  (Tr. 379-80).

9

## II.   STATEMENT OF THE CASE

Based upon a charge filed November 22, 2010 and amended January 11, 2011, the Region conducted an administrative investigation.  (GCX #1(a); GCX #1(c)).  On August 25, 2011, the Regional Director for the Region, acting on behalf of the NLRB's Acting General Counsel, issued a Complaint and Notice of Hearing and amended such on October 27, 2011.  (GCX #1(e); GCX #1(j)).  The Amended Complaint alleged, *inter alia*, that Renaissance violated Section 8(a)(1), (3) and (5) of the Act by engaging in bad faith bargaining, unilaterally subcontracted certain bargaining unit work, and conditioning the avoidance or conclusion of a lockout on a permissive subject of bargaining.  (GCX #1(j)).  A hearing before Judge Fish took place on November 15 through 18, 29 and 30, and December 9, and 12 through 16, 2011.

On December 27, 2011, the Region advised that it would seek authorization from the Board to file the instant Petition.  On January 20, 2012, the Region informed Renaissance that the Board had authorized the Regional Director to file the instant Petition.

## III.   STATEMENT OF THE FACTS

### a.   The parties, property, employees, and bargaining relationship.

Renaissance, Gunki Holdings, LLC and Security Equity, LLC are owners of Flatbush Gardens, a 59 building residential apartment complex in East Flatbush Brooklyn, New York.  (Tr. 1431, 1432; RX #16).  In October of 2005, Renaissance purchased Flatbush Gardens, which was previously known as Vanderveer Estates.  (Tr. 1432, 1433).  Prior to Renaissance's purchase, the property was rundown, had many previous owners that could not handle its complexity, and was "completely mismanaged".  (Tr. 1433).  Following the purchase, Renaissance uncovered a great deal of waste in expenditures and the way repairs were being done at the property.  (Tr. 1434).  Despite the mismanagement, Renaissance believed the

10

property would work with appropriate marketing and continued improvements that would attract different, better paying tenants. (Tr. 1433, 1434). Then the real estate recession commenced in 2007 and 2008.

The collective bargaining agreements ("CBA" or "contract") with the Union, and provisions thereof, relevant to the issues in this case include the 2003 RAB Agreement, as modified by the Memorandum of Agreement between Gateway Sherman, Inc. and the Union dated February 6, 2004 ("2004 MOA"), which Renaissance adopted in November of 2005. (JTX #1(a); JTX #1(b)); and, 2) 2006 Apartment House Agreement, as modified by the 2006-2010 Rider ("2006 Rider") between Renaissance and the Union dated February 15, 2007 (JTC #1(c); JTX #1(d)).

The 2004 MOA and the 2006 Rider both contain the following subcontracting clause:

> The parties understand and agree that substantial renovation and major repair work **will be** performed by outside contractors. It is further understood that such work **is not** bargaining unit work and that utilization of outside contractors to perform it does not violate this Agreement. Traditional handyman and porter work will be reserved to the bargaining unit.

(JTX #1(b) at pg. 2, ¶ 4, and #1(d) at pg. 1, ¶ 3) (emphasis added). In 2008, the parties agreed to maintain a minimum of seventy (70) bargaining unit employees and modified the subcontracting clause to clarify that:

> any employees of the Employer who perform renovation and major repairs at the property are now, and have been at all times, excluded from the scope of the CBA, provided that such employees are not assigned to perform bargaining unit work on a regular basis or to fill-in for unit employees who are on leave for reasons of vacation, sick, workers' compensation or disability.

(JTX #1(e) at pg. 2, ¶ ¶ 7, 8).

11

Also relevant is the Most Favored Nations Clause found in the 2010 RAB Agreement which reads, in pertinent part:

> In the event that the Union enters into a contract . . . with any Employer(s) covering apartment buildings which contain new or revised economic terms or other conditions which are effective on or after April 21, 2010, which economic terms or conditions are more favorable to such Employer(s) than the terms contained in this Agreement, the RAB and all its member buildings shall be entitled to and may have the full benefit of any and all of such more favorable terms, upon notification to the Union.   This provision may be waived in writing for good cause shown by the President of the RAB or his designee and the President of the Union or his designee.

(CPX #2).

**b.   <u>Renaissance's financial condition going into negotiations with the Union.</u>**

The parties most recent CBA expired on April 20, 2010.   (JTX #1(c)).   Since Renaissance's purchase of Flatbush Gardens in 2005, it was losing millions of dollars year after year and the principals poured in over fifteen million dollars in capital contributions[4] just to keep the place afloat and pay the bills.   (Tr. 1489; JTX #9 and  #16).   Renaissance had taken a number of steps over the years to cut costs, such as: (1) terminating half of the office staff; (2) cutting the security budget; (3) reducing the advertising and marketing; and, (4) controlling spending on supplies and materials. GCX #5; RX #37).   There was an urgency to negotiate a new CBA with the Union so that Renaissance would be able to make significant changes in the cost of its operations in order to survive.   (RX #6 at pgs. 1-2).   In January of 2010, Renaissance attempted to get the Union to negotiate a new contract, but this attempt took over six months. (JTX #2, 3, 4, and 5; RX #2, 3, 4, 6 and 7).   Renaissance advised the Union of its dire financial

---

[4]  A capital contribution resulted from a capital call, which is triggered when the bank called to say that the account is overdrawn and is in need of money.  (Tr. 1488).  Once this call was made, Renaissance would advise the principals how much overdrawn the account was and each principal would contribute their appropriate share of capital to the account. (*Id.*).

condition by telephone before May 27, and in an email dated May 27. (Tr. 1240-41, 1958, 1959; RX #6 at pgs. 1-2). Finally, the Union agreed to meet and negotiate on June 15. (RX #7).

### c. **The Union's negotiators acknowledged that Renaissance was experiencing multimillion dollar losses each year after receivieng a Statement of Operations and reviewing Renaissance's financial books and records on two separate occasions.**

#### i. *The Mayer Rispler Report.*

At the parties' first negotiation session Renaissance invited the Union to review its financial books and records and, at the second negotiation session, Renaissance provided the Union with a three-year Statement of Operations, known as the Mayer Rispler Report, that Renaissance's accounting firm prepared based on a review of Renaissance's books and records. (Tr. 175, 178, 1846, 1853, 2233; JTX #9). The Mayer Rispler Report shows Renaissance's actual income and actual expenses for the three-year period (2007, 2008, 2009), that is, cash-in and cash-out, to show the bottom line result of each of the years' operations. (JTX #9). Petitioner's brief incorrectly asserts that (1) rental income and (2) repairs, maintenance and supplies are line items in the Mayer Rispler Report that contained discrepancies which the Union was not privy to during the negotiations. (Petitioner Br. at pg. 5). In addition, (3) Petitioner alleges that proceeds of a sale by the Gunki entity of property **unrelated** to Flatbush Gardens should have been treated as income to Renaissance. The testimony at the hearing—as noted in the brief sections below—clearly prove that Petitioner is wrong on each of the foregoing items and that the Mayer Rispler Report is completely accurate.

#### 1) **Rental income.**

The line item in the Mayer Rispler Report for rental income reflects all of the rental income **actually** collected during the year and what was going to be collected subsequent to the end of the year based on the fact that a particular tenant's rent had been collected before. (Tr.

1352, 2271). The Union's paid expert witness, Paul Pocalyko, testified that the line item for rental income in the Mayer Rispler Report did not agree with the numbers reported to New York Community Bank ("NYCB"), in connection with a loan modification. (Tr. 1320, 2128, 2130, 2146; JTX #9; GCX #20(c)). Jacob Schwimmer, Renaissance's managing agent, testified that the rental income line item on the Mayer Rispler Report reflected actual dollars collected, or to be collected, whereas the numbers reported to NYCB were merely projections based on a rent roll. (Tr. 1353). NYCB's Second Vice President, Netanel Yoghoubi, confirmed that the numbers reported to the bank were projections based on the rent roll—not actual amounts. (Tr. 1299; 1325, 1327, 1353, 1354; GCX #20(c); #22 and #23). Pocalyko confirmed the numbers in the Mayer Rispler Report were in the general ledgers, which were made available to the Union during its review of Renaissance's financial books and records. (Tr. 1498, 1499, 2169, 2242).

**2)**     <u>**Repairs, maintenance and supplies.**</u>

The line item in the Mayer Rispler Report for repairs, maintenance and supplies in 2008 is $3,941,713, but the number reported to NYCB was $682,982. (JTX #9 and GCX #20(a)). Schwimmer testified that the amount for repairs, maintenance and supplies in the 2008 line item in the Mayer Rispler report were **actual dollars spent** and reported on the books, but that Renaissance's mortgage broker reported to the bank only those costs that it believed the bank would be interested in if it had to take over the property, such as routine expenses that every building incurs. (Tr. 1356, 1358, 1359). Schwimmer compared the numbers on Renaissance's 2008 profit and loss statement with the numbers reported to the bank, and testified in detail as to which amounts Renaissance's mortgage broker reported to the bank as being of interest. (Tr. 1358-36; JTX #16; GCX #20(a)). Renaissance provided the Union with the 2008 profit and loss statement during bargaining. (JTX #16).

14

### 3)      Gunki's sale of the Williamsburg property.

Additionally, Petitioner notes that Renaissance "failed to disclose a $28 million dollar disbursement to its partners." (Petitioner Br. at pg. 5). This disbursement was from the sale of a property wholly unrelated to Renaissance, and was fully disclosed to the Union through the general ledgers, tax returns and balance sheets provide to the Union for its review.  In 2007, Gunki Holdings, LLC ("Gunki") sold a parcel of property in the Williamsburg section of Brooklyn that was completely unrelated to the Renaissance operations at Flatbush Gardens. (Tr. 2089, 2304).  The selling price was approximately $28 million.  (Tr. 2089, 2229).  To defer the taxes on the $28 million selling price, Gunki availed itself of the tax laws and structured a transaction known as a 1031, like-kind exchange ("1031 exchange").  (*Id.*)

A 1031 exchange allows the tax on the gain associated with the sale of property to be deferred if, within six months of the sale, the proceeds are invested in another property.  (*Id.*)  To take advantage of a 1031 exchange, the original property that is sold must be unrelated to the property in which the proceeds are being invested.  (Tr. 2157).  However, the sale proceeds can be invested in a related property.  (Tr. 2230).  A seller in a 1031 exchange can never have access to the proceeds, but the law permits an escrow agent to "park" the money until it is used for the subsequent purchase.  (Tr. 2303-04).

Gunki's partners placed the sale proceeds from their Williamsburg property with Madison Title, the escrow agent, and then purchased from Renaissance Equity Holdings, LLC C buildings known as Lot C for approximately $28 million.  (Tr. 2304).  The money from the sale of Lot C went directly to Madison Title, stayed there, and once free to be distributed, was distributed by Madison Title to Gunki's partners.  (Tr. 2304, 2308).  This money, which had nothing to do with Renaissance, was Gunki's proceeds from the sale of the Williamsburg

property, subject to the tax deferral, and Gunki could have directed Madison Title to distribute those proceeds to anyone. (Tr. 2305, 2308).

The $28 million, however, is reflected as a book entry[5] in the general ledgers, noted on the tax returns, and shown on the balance sheet. (Tr. 2157, 2304-05, 2309). The general ledgers, tax returns and balance sheets were all made available to the Union during negotiations. (Tr. 1498, 1499, 2242; JTX #16).

ii.   ***The Union reviewed Renaissance's financial books and records on two separate occasions and acknowledged Renaissance's losses during negotiations.***

Schwimmer believed from a July 20 letter from the Union that a group of people from the Union were going to review Renaissance's financial books and records, spending several days to do so. (Tr. 1496, 1569). Renaissance instructed its accountants to make sure all the financial books and records requested were available to assist the Union during the review. (Tr. 1496).

The meeting began around 10:00 a.m. on July 27 at Renaissance's main office. (Tr. 1495, 2240). Reis, the Union's Director of Finance and Administration and a certified public accountant, was the only person that attended for the Union. (Tr. 651, 689, 1495). The following items were available at the offices for Reis' to inspect: (1) Renaissance's general ledgers for 2007, 2008, 2009; (2) Renaissance's tax returns for 2007 and 2008; (3) Gunki's tax returns for 2007 and 2008; (4) Security Equity's tax returns for 2007 and 2008[6]; (5) records used in the preparation of the tax returns; (6) payroll records; (7) accounts payable and receivable; (8) all paid bills; (9) rent rolls; and, (10) up to date income and expense records for 2010. (Tr. 149, 1499, 2242). Schwimmer testified he also had available 11 boxes of material from 2007 and

---

[5]  A book entry is a transaction that has to be reflected in the books that does not come through a cash account. (Tr. 2304).
[6]  The 2009 tax returns for Renaissance, Gunki and Security Equity were not available as they were not completed by July 27; they are typically completed in September. (Tr. 1498, 2243).

2008 that were already in storage, because he was not sure what the Union's financial management personnel were going to review. (Tr. 1497). While the tax returns were available, Reis did **not** ask for them during this meeting and Schwimmer confirmed this. (Tr. 699, 1499).

Reis conducted his review alone, and either Schwimmer or Friedman answered all of his questions and provided whatever help he needed. (Tr. 693, 705). Indeed, Reis testified that both Schiwmmer and Friedman were cooperative and his review was not impeded in any way by anyone at Renaissance. (Tr. 692). Reis' review concluded within two hours. (Tr. 1497, 1569, 2242). Schwimmer testified that he was shocked and surprised that only one individual showed for the review and left two hours later. (Tr. 1569). Friedman testified that Renaissance is a very complicated operation, and in his professional opinion, there was no way someone could get an understanding of what is going on at Renaissance in just two hours. (Tr. 2243). As Reis left the meeting, he requested a balance sheet comparison between 2008 and 2009, a 2008 profit and loss statement, and accrued expenses, which were all sent to the Union. (JTX #16; RX #30).

According to Terry Meginniss, the Union's General Counsel, Reis said that the best way for him to be able to do an analysis would be to get the documents. (Tr. 287). Reis testified just the opposite. He said that Meginniss and he did not discuss the issue of having Renaissance copy and send its financial records to the Union and, furthermore, Reis believed that after this meeting, what he needed to do was pretty much accomplished. (Tr. 707, 757).

On August 19, the Union conducted a second review of Renaissance's financial books and records. Meginniss advised Renaissance that the second financial review was going to focus on the general ledgers and J-51 tax abatements, which are real estate credits for building owners in New York City who make certain property improvements. (Tr. 1510; JTX #20). The review occurred at the location of the previous financial review, Renaissance's main offices. (Tr. 660,

1515, 2375).    Schwimmer and Renaissance accountant, Efrayim Steigman, attended for Renaissance and Reis, again, attended alone for the Union. (Tr. 660, 1515, 2375).

The meeting began around 11:00 a.m. and was again held in the conference room.  (Tr. 1516, 2375).   Steigman and Schwimmer testified that there were a significant number of documents in the center of the table including general ledgers, tax returns for Renaissance, Gunki and Security Equity for the years 2007 and 2008, profit and loss statements for 2008 and 2009, and sub-ledgers for line items on the Statement of Operations (i.e, the Mayer Rispler Report). (Tr. 1516, 1592, 2375, 2379).

The profit and loss statement provided to the Union included all seven lots, but those seven lots are reported on three different tax returns because three separate entities combine to own all seven lots at Flatbush Gardens.  (Tr. 2265, 2377).   Steigman walked Reis through a reconciliation of the profit and loss statement provided to the Union and the tax returns available during Reis' inspection, by turning directly to IRS Form 8825 in the Renaissance 2008 tax return.  Steigman reconciled for Reis the net loss reflected on Form 8825 to the net loss reflected on the profit and loss statement where it reads "reconciliation to tax return".  (Tr. 2378; JTX #16; CPX #16).  Reis did not have any questions and seemed satisfied with Steigman's explanation. (Tr. 2378).  The meeting ended around 3:00 p.m. and Schwimmer asked Reis to use the entire date to complete his review so as to avoid further delay, but Reis said that he was done, he had to leave, and left without requesting anything further.  (Tr. 716, 1518, 1519, 2378).

Reis testified that he did not request anything from Renaissance at the end of the meeting. (Tr. 713).  He later testified that he requested tax returns for the two lots at Flatbush Gardens that are not owned by Renaissance Equity Holdings, LLC, and was told those returns would not be made available as they disclose other entities not associated with Renaissance.  (Tr. 716).  This is

inconsistent with the testimony of Schwimmer and Steigman, who both said that Reis requested nothing. (Tr. 1519, 2378). Moreover, Meginniss' actions confirm the testimony of Schwimmer and Steigman. In this regard, Meginniss testified that he made one request for the tax returns on July 20, and did not renew that request. (Tr. 304, 365; JTX #12). Meginniss further testified that following the second financial review, he was not aware of any correspondence from the Union requesting additional copies of anything. (Tr. 319). In fact, there was none, and Meginniss testified that after the second financial review the Union never requested a further review. (Tr. 316).

Raab, one of the Union's lead negotiators, acknowledged at least four times during bargaining that Renaissance was losing money. (Tr. 408, 507, 508, 1865; JTX #30; RX #4; CPX #4). The Union also did not claim that that Renaissance owed the Union any information. Indeed, Renaissance chief negotiator, Stephen Ploscowe, Esq., asked Raab at negotiations on September 8 whether Renaissance owed the Union anything in the way of information and Raab responded "no". (Tr. 1527, 1898; RX #44). Ploscowe confirmed Raab's assertion in writing, which was also received by the Union's other negotiator, Meginniss. (Tr. 2065; JTX #26 at pg. 2-3; RX #46).

### d.    Renaissance presented the Union with its Last, Best and Final Proposal.

On September 1, Renaissance proposed its Last, Best and Final Proposal ("Final Offer"). (JTX #23). The Final Offer included the following changes. Renaissance agreed to the Union's pension proposal. (Tr. 1890, 1991). Renaissance modified its health proposal by agreeing to the Union's contribution rate in the first year of any new agreement, asking that the contribution rate stay at the first year rate of $1,020.55 per employee, per month, and that any increases in the contributions above $1,020.55 be paid by the employees. (Tr. 1890; JTX #23). This proposal cost employees less than Renaissance's initial proposal of a ten percent employee contribution,

and the Union had the option of not increasing the contributions, altering the plan, or placing the employees in one of the Union's less costly plans so as to not have the employees bear the costs of any contributions. (Tr. 1890; JTX #6; JTX #23).

Renaissance had made other changes to its initial proposal prior to the Final Offer; namely, withdrawing its initial proposals to: (1) get out of the Union's Office of Contract Arbitrator, (Tr. 1855-56; JTX #10); (2) eliminate overtime after eight hours for all employees, and modifying it to apply only to new employees (Tr. 1856; JTX #10); (3) eliminate overtime for all employees who are called-in off-shift, and modifying it to apply only to new employees; (4) apply a new reduced vacation schedule to all employees, and modifying it to apply only to new employees; and, (5) eliminate the perfect attendance bonus. (Tr. 1857; JTX #10). Renaissance did not modify its wage proposal in light of the Union's constant insistence on wages consistent with the residential industry-wide RAB Agreement, which applied to 25,000 employees including Park Avenue apartment house workers. (JTX #23; RX #42). Moreover, Renaissance maintained its position to reduce the number of holidays and sick days, eliminate the "cashing out" or "carrying over" of personal days, eliminate the workweek definition, provide healthcare coverage to full-time employees only, schedule and layoff employees at its sole discretion, and subcontract all bargaining unit work with one week advance notice. (JTX #6; JTX #23). Despite Renaissance maintaining its position on certain proposals, the Union never once discussed these proposals—except for the subcontracting proposals—other than to simply reject them.

In reviewing the Final Offer, Renaissance read through Article VIII: Terms of Agreement and Reopening, wherein it states that "[t]his agreement shall commence on ratification by the bargaining unit and terminate the last day of the month two (2) years thereafter." (JTX #23). Ploscowe testified that he did not care how the Union accepted the agreement, the Union just had

20

to accept it. (Tr. 1888). Ploscowe testified that in his many years of experience negotiating union agreements, where there is going to be a reduction in employee's pay, he has never experienced a union that has not taken the offer back to the membership for a vote. (Tr. 1887, 2055).

Ratification was used in the Final Offer, Ploscowe went over the Final Offer, the parties saw the word in Final Offer, but there was no discussion, no questions about what it meant or anything at all. (Tr. 1956). Indeed, the Union never objected to, or otherwise questioned or discussed ratification at any bargaining session or in any correspondence thereafter. (Tr. 1619, 1620, 1889).

e.   **Renaissance's right to subcontract.**

The parties' CBA provided:

> The parties understand and agree that substantial renovation and major repair work will be performed by outside contractors. It is further understood that such work is not bargaining unit work and that utilization of outside contractors to perform it does not violate this Agreement. Traditional handyman and porter work will be reserved to the bargaining unit.

(JTX #1(b) at pg. 2, ¶ 4 and #1(d) at pg. 1, ¶ 3) (emphasis added).

Contractors performed work in both vacant and occupied apartments. (Tr. 880, 882, 1640). This practice occurred before Renaissance purchased Flatbush Gardens and continued under Renaissance's ownership. (Tr. 1441; RX #18). The practice at Renaissance was, that if a maintenance repair was beyond the capabilities of the unionized employees, contractors were given the assignment. (Tr. 1638-40). Union employee Herman Hinds confirmed the foregoing—that the contractors perform work in occupied apartments when the nature of the job was too much for unionized employee to handle. (Tr. 881, 882). Hinds provided a number of examples at the hearing. (Tr. 888-90; 891-95; 913-15; 923-25).

21

The same process was followed with respect to the assignment of work when correcting new violations found by the New York City Department of Housing Preservation and Development ("HPD"), but not followed when those violations must be removed through a mass dismissal request, which is when entire buildings are inspected by HPD in order to remove violations. (Tr. 1641, 1642).[7] New HPD violations are assigned to unionized employees unless those employees do not have the capability to perform the job. (Tr. 1462). If a unionized employee can fix the violation within the time period for correction, a Certification of Correction is filed with HPD and the violation is removed from record. (Tr. 1448, 1449; RX #22).

If the violation is not cured within the time period allowed by HPD, the violation remains on record and the only way to remove it from record is through an inspection. (Tr. 1448, 1449).[8] Renaissance does not take chances during a mass dismissal request. In such cases, it sends in a team of contractors to correct anything and everything that may be a violation in order to present the building in the best light so that the HPD inspector dismisses as many violations as possible. (Tr. 1449, 1641).

Renaissance engaged in two mass dismissal requests, one in February 2007 and the other in September 2010. In February of 2007, Renaissance increased its direct hire, non-union employees, to between 40 and 50 in order to assist with the processing of the dismissal request. (Tr. 1463, 1667). At some point during the year-long dismissal request process, the Union

---

[7] HPD has an enforcement division which issues violations for failing to comply with the housing code. (Tr. 1448). There are three categories of violations, "A", "B" and "C", with "A" being the least significant violation, and "C" being a serious violation. (*Id.*). "C" violations must be cured within a short period of time, approximately two weeks, and "A" violations must be cured in approximately 90 days. (*Id.*).

[8] The inspection process is initiated by the filing of a Dismissal Request and a fee of $300.00. (Tr. 1448). Once a dismissal request is processed, HPD provides an initial inspection date and two alternatives, in the event that the apartment in which the inspection is to take place has a tenant not available on the initially scheduled date. (*Id.*). A dismissal request is a critical process, because the buildings are not only being inspected to determine whether the violations specific to the dismissal request have been corrected, but also to determine if there are other violations in which tenants have not filed complaints. (Tr. 1449, 1641).

challenged through the grievance procedure in the CBA Renaissance's use of direct hire, non-union employees, performing the mass dismissal request. (Tr. 1438). The parties' settled the grievance, and in doing so modified the subcontracting clause to reflect that Renaissance was permitted to not only use subcontractors, but could also use non-bargaining unit employees to perform renovation and repair work, so long as those employee are not assigned to perform bargaining unit work on a regular basis. (JTX #1(e) at pg. 2 ¶ 8).

As part of its bargaining strategy, the Union vigorously encouraged Flatbush Gardens' tenants to file HPD violations against Renaissance. In late September 2010, Renaissance increased its use of subcontractors at Flatbush Gardens. (Tr. 1464). The reason for this was that in late August of 2010, New York City's Public Advocate, Bill DiBlasio, created a Worst Landlord Watch List and in late September DiBlasio's office placed one of Flatbush Gardens' principals, David Bistricer, on the list because of the high number of HPD violations at the property. (Tr. 1465; GCX #19). Placement on the list drew negative publicity for Flatbush Gardens and, therefore, Renaissance immediately dealt with the problem by speaking with contractors on-site to assist with a mass dismissal request. (Tr. 1467, 1468; RX #24). Renaissance decided to start the process by using the contractors and did so by assigning them the worst buildings. (Tr. 1468).

Renaissance asked DiBlasio to visit Flatbush Gardens and DiBlasio agreed. (Tr. 1468). Renaissance sought to have Bistricer removed from the Worst Landlord Watch List, but DiBlasio refused, citing preset criteria for which buildings make it on the list. (*Id.*). On the same day that DiBlasio visited Flatbush Gardens, the Union was working hard with DiBlasio's office in an attempt to place Bistricer in an unpleasant light with the hopes of having New York City revisit the leases it had with Bistricer at other properties he and his partners owned. (RX #27). In an

email exchange between the Union and Public Advocate's office, the discussion centered around "locking in a reporter" at one of the "major dailies" to reveal the leases Bistricer had with the City juxtaposed with the violations at Flatbush Gardens. (*Id.*). The Public Advocate's office intended to "blow up" the fact that Bistricer was on the Watch List.

A few days later Renaissance received letters that the Public Advocate wrote to the City and to Mayor Bloomberg. (GCX #18; RX #25). The contents of these letters were exactly what the Public Advocate's office told the Union would be in the letters. Namely, to advise the New York City Department of Citywide Administrative Services and Mayor Bloomberg that the City had leases with Bistricer and that he was on the Worst Landlord Watch List. (*Id.*). Renaissance asked the two contractors on site to provide as much manpower as each could to expedite the process of removing the violations in order to come off the Worst Landlord Watch List as fast as possible. (Tr. 1471). The two contractors were already being used for renovation work and, therefore, familiar with the property; thus, using these contractors was seen as being the fastest way to achieve the goal of getting off the list. (Tr. 1475).

Renaissance increased the work assigned to these contractors and each hired new personnel which they assigned directly to correcting the violations in advance of the dismissal request. (*Id.*). In or around December 20, 2010, HPD conducted the first round of the dismissal request inspections at Flatbush Gardens. (Tr. 1478). Thereafter, the inspections were scheduled every other week with the last of the inspections occurring in July of 2011. (*Id.*).

Schwimmer testified that since the Union's 2008 grievance, to the date of the lockout, Renaissance did not receive a single grievance from the Union grieving Renaissance's use of contractors to perform the work they were performing or alleging that Renaissance was not employing the contractual minimum of 70 bargaining unit employees. (Tr. 1476, 1477). During

the same period of time, Renaissance maintained approximately 70 bargaining unit employees on its payroll. (Tr. 1477). Moreover, when Renaissance increased its use of subcontractors between late September and November of 2010, Renaissance did not layoff or terminate any bargaining unit employees. (*Id*.). Renaissance also did not change any terms or conditions of the bargaining unit employees when it increased its use of subcontractors between late September and November of 2010. (*Id*.). Finally, at no time did the Union file a grievance that any of the bargaining unit employees were effected by Renaissance's increased use of subcontractors between late September and November of 2010 to handle the dismissal of the HPD violations. (Tr. 1478).

### f.    The Lockout.

On November 18, 2010, Renaissance served the Union with its notice of lockout. (JTX #35 at pg. 1). Ploscowe's email to Raab and Meginniss attaching the lockout letter and Renaissance's Final Offer, notified the Union that on November 29 Renaissance would lock out employees until such time as the employees ratified a new agreement. (*Id*. at pgs.1-2). A similar notice was sent to employees. (Tr. 1615, 1616). On November 29, Renaissance locked out its employees. (GCX #1(g)).

At no time between the date of the lockout letter (November 18) and the date of the lockout (November 29), or thereafter, did anyone from the Union contact anyone at Renaissance to discuss, question, or otherwise object to, the lockout letter, the attached Final Offer, the letter to employees advising them of the lockout, or any requests for information. (Tr. 379, 1531, 1711, 1911).

## IV.    ANALYSIS

Injunctive relief under Section 10(j) of the Act is an "extraordinary remedy" to be used only in the limited circumstance where "the remedial purpose of the Act would be frustrated

unless immediate action [is] taken." *McLeod v. General Elec. Co.*, 366 F.2d 847, 849 (2d Cir. 1966), *vacated as moot*, 385 U.S. 533 (1967). To be entitled to this extraordinary relief, the Board must establish that (1) there is "reasonable cause to believe that unfair labor practices have been committed" and (2) the requested relief is "just and proper." *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 365 (2d Cir. 2001); *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir. 1980).

In determining whether "reasonable cause" exists, "[a]ppropriate deference must be shown to the judgment of the NLRB (in this case, Judge Fish), and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed." *Silverman v. Major League Baseball Player Relations Comm.*, 67 F.3d 1054, 1059 (2d Cir. 1995). The Board must show that there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals." *McLeod v. Business Machine and Office Appliance Mechanics Conf. Board*, 300 F.2d 237, 242 n.17 (2d Cir. 1962). If the district court is convinced that the Board's legal position is wrong, reasonable cause is not met. *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1033 (2d Cir. 1980).

a.   **This Court should defer to Judge Fish's preliminary opinion that the Region's surface bargaining case is weak and full of holes, and find that there is no reasonalble cause to believe Renaissance engaged in surface bargaining.**

In determining whether a party has violated its statutory duty to bargain in good faith, the Board examines the totality of the party's conduct, both at and away from the bargaining table. *Public Service Co. of Oklahoma (PSO)*, 334 N.L.R.B. 487 (2001); *Overnite Transportation Co.*, 296 N.L.R.B. 669 (1989); and *Atlanta Hilton & Tower*, 271 N.L.R.B. 1600 (1984). From the context of the party's total conduct, the Board must decide whether the party is engaging in hard, but lawful, bargaining to achieve a contract that it considers desirable, or is unlawfully

endeavoring to frustrate the possibility of arriving at any agreement. *PSO*, 334 N.L.R.B. at 487.

Petitioner correctly points out that "the Board is not privileged to second guess a party's

bargaining proposals". *Houston Cty. Elec. Coop.*, 285 N.L.R.B. 1213, 1215 (1987).

### i.  *The Bargaining.*

Renaissance pleaded with the Union to immediately commence bargaining since Flatbush

Gardens was operating at multimillion dollar losses.   The Union ignored Renaissance's

numerous requests.   Instead, almost six months later and two months **after the CBA expired**,

and after Renaissance threatened filing an unfair labor practice charge or unilaterally changing

the terms and conditions of employment, the Union finally agreed to meet and start bargaining.

Renaissance entered negotiations without hiding or otherwise attempting to downplay its

serious economic distress.   In fact, Renaissance alerted the Union to its dire financial condition

in an early telephone conversation and again on May 27, 2010 (prior to the first bargaining

session).   At the first negotiation session, Renaissance proposed that the Union meet with

Renaissance's accountants and at the second negotiation meeting, gave the Union a detailed

summary of its operational income and expenses which reflected its multimillion dollar losses.

In both the first and second negotiation meetings, Renaissance also carefully explained to the

Union all the other steps it had taken to reduce its operating costs.   Renaissance's message was

clear—it was losing multimillions of dollars and needed to lower its operating costs to survive.

However, the Union refused to help Renaissance lower its costs, and brazenly stated that it was

more concerned with its other members, than it was about the 70 bargaining unit employees who

worked at Flatbush Gardens.

Renaissance carefully reviewed its bargaining proposals with the Union and explained

the need for each of those proposals with the Union.   Renaissance admitted that the proposals

were drastic, but so too was the dire financial status Renaissance faced.   The Union never once

made specific objections to Renaissance's proposals.  Indeed, the hearing was the first time that the Union claimed that no self-respecting union would agree to such proposals.  The reason the Union did not specifically object at the bargaining table is because it knew that Renaissance's proposals were designed to bring it the immediate economic relief it needed so desperately. Significantly, the Union's in-house accountant who reviewed Renaissance's financial books and records on two separate occasions confirmed that Renaissance was suffering multimillion dollar losses each year.  Even the Region's expert forensic accountant witness, retained and paid for by the Union, confirmed that Renaissance was "operating at a loss".  (Tr. 2207).

Raab, the Union's chief negotiator, acknowledged Renaissance's dire financial condition across the table at several sessions, and in related emails.  Notwithstanding Raab's admissions, the Union proposed wage increases **greater than** the RAB Agreement.  Further, the Union's final proposal insisted on all RAB Agreement increases to various benefit funds (health and welfare, pension, etc.), plus wage increases which, obviously, were going to increase—not decrease—Renaissance's operating costs and losses.  As stated throughout these bargaining sessions, Renaissance repeatedly explained that it needed to lower its costs, not increase them.

Despite Renaissance's dire economic condition, the Union was trying to force Renaissance to accept the RAB Agreement.  The Union's motive was transparent.  The RAB Agreement contained a Most Favored Nations Clause which would have required the Union to offer all signatory employers the relief that Renaissance needed.  Put differently, if the Union agreed to Renaissance's proposed wage and benefit reductions, it would have to offer those reductions to all of the employers who were signatory to the RAB Agreement.  Consequently, the Union treated the instant negotiations as "one size fits all" bargaining, and took the untenable

position that Renaissance had to accept the RAB Agreement—and lose additional millions of dollars—in order to protect the Union's institutional interests.

More pointedly, although Raab expressly recognized Renaissance's financial condition, he explained that the Union was **not** going to save 70 members at the risk of jeopardizing the other 25,000. Needless to say, Renaissance took little comfort in the Union's statements, and recognized that the Union's take-it or leave-it approach could result in the complete financial collapse of its business. When Renaissance warned Raab that is may not survive, Raab said that based on his experience, the "ship never goes down" and that some other company would buy the property if Flatbush Gardens collapsed. Further, Judge Fish commented during the hearing that he was concerned with the Union's arguable bad faith—raised by Renaissance as an affirmative defense—by continually insisting on the RAB agreement. (Tr. 791).

### ii.    *The Financial information and copies.*

Renaissance provided the Union with all of the information it requested. The Union conducted two financial reviews wherein Renaissance made available the following documents for the Union to inspect: (1) Renaissance's general ledgers for 2007, 2008, 2009; (2) Renaissance's tax returns for 2007 and 2008; 3) Gunki's tax returns for 2007 and 2008; (3) Security Equity's tax returns for 2007 and 2008[9]; (4) records used in the preparation of the tax returns; (5) payroll records; (6) accounts payable and receivable; (7) all paid bills; (8) rent rolls; and, (9) up to date income and expense records for 2010. In addition, Renaissance provided the Union with a three-year Statement of Operations, balance sheet, and a profit and loss statement. All of the alleged "discrepancies" in the numbers were right under the Union's noses for them to scrutinize, and discuss with Renaissance. The problem—frankly speaking—was the Union did

---

[9] The 2009 tax returns for Renaissance, Gunki and Security Equity were not available as they were not completed by July 27; they are typically completed in September. (Tr. 1498, 2243).

29

not care about Renaissance's financial condition. Indeed, the Union fully recognized that Renaissance was losing money, and it was more concerned about protecting its institutional interests. Accordingly, it did not need to engage in any debate with Renaissance; it was one-size fits all negotiations and it simply sat on its laurels and waited for Renaissance to cave.

Even assuming, *arguendo*, that Renaissance refused to provide the Union with the information it requested, the Board has held that where the unlawful withholding of the information did not materially affect the progress of negotiations, the ensuing lockout is lawful notwithstanding the unremedied violation. *Paccar, Inc.*, 357 N.L.R.B. No. 13, *4 (2011) (citing, *Brewery Products*, 302 N.L.R.B. 98, 98 n.2 (1991) (finding lockout lawful where "the parties' bargaining positions were so polarized at the time of the lockout" that the employer's failure to furnish relevant requested information "did not preclude meaningful bargaining"). Here, the parties were so polarized on wages and benefits that such information was not going to otherwise preclude meaningful bargaining.

As to the Union's request for copies, a party is not automatically entitled to copies of records sought. The Board balances the volume and nature of the information; whether furnishing a photocopy would give greater assurance of accuracy and completeness; and the comparative cost and convenience to both parties of providing the photocopy. *Stella D'oro Biscuit Co., Inc.*, 355 N.L.R.B. No. 158, *5 (2010) (citing, *American Telephone & Telegraph Co.*, 250 N.L.R.B. 47, 54 (1980). Here, the request for copies, which Petitioner neglects to advice this Court of, was for the detailed general ledgers. Detailed general ledgers amount to thousands of pages of documents, including all of the backup invoices and other records for all income and expenses made during a year—a completely voluminous request in the form of file cabinets worth of information. Moreover, instead of receiving the copies, the Union agreed to

meet with Renaissance's accountants and review the requested records at Renaissance's offices. Thereafter, there was no request for copies of any records and the Union's chief negotiator stated clearly at bargaining that Renaissance had provided the Union with everything the Union had requested, and did not owe the Union anything.

### iii.    *The Healthcare, Safe and Healty Workplace, and "Off the Record" Proposals.*

The Board defines "regressive" bargaining as a change from a prior more favorable bargaining proposal. *Brink's USA*, 354 N.L.R.B. 41 (2009) (citing *Mid-Continent Concrete*, 336 N.L.R.B. 258 (2001)).    While Renaissance did not engage in regressive bargaining, it is important for the Court to note that regressive bargaining is not *per se* unlawful absent other indicia of bad faith.    *Challenge-Cook Bros.*, 288 N.L.R.B. 387 (1988); *Telescope Casual Furniture*, 326 N.L.R.B. 588 (1998) (holding that regressive bargaining is unlawful if it is for the purpose of frustrating the possibility of agreement).

Renaissance's initial healthcare proposal was that: (1) employees would contribute 10% of the cost of healthcare, leaving Renaissance with the remaining contribution of 90%; and, (2) coverage would extend only to full-time employees.[10]    Renaissance's final healthcare proposal provided that: (1) coverage would be extended only to full-time employees; (2) it would continue to contribute to the Union's health fund the amount the Union was demanding in Year 1 (i.e., $12,246.64 per year, per employee), and that any increases mandated by the Union for its health fund would be paid by the employee; and, (3) it would create a "cafeteria plan" and provide employees with a $250 monthly payment in the event they opted out of health benefits coverage.

Renaissance's Final Offer is a more favorable proposal for the employees than its prior proposals in that it eliminated the 90/10 employer-employee contribution split and required any

---

[10]    Renaissance did not have, and still does not have, part-time employees.

increases after Year 1 to be paid by the employees. This placed some pressure on the Union to maintain the Year 1 cost of the medical plan or reasonable increases that would be paid by employees. The Year 1 healthcare costs called for Renaissance to contribute to the Union's health fund $12,246.64 per year, per employee. The RAB Agreement demanded by the Union at negotiations increased healthcare contributions in Year 2 to $12,870.64 per year, per employee, an increase of $624.00 per year, per employee. If the employees were to pay 10% of the Year 1 and Year 2 contributions, $1,224.66 and $1,287.06, respectively, they would have paid a total for the two years of $2,511.72. This would have been the employee's contribution under the original 90/10 healthcare proposal by Renaissance. However, under Renaissance's Final Offer, the employee's would pay only $624.00; that is, nothing in Year 1 and $624.00 in Year 2 (the difference between the Year 1 cost of $ 12,246.64 and the year 2 cost of $ 12,870.64). This equates to a savings to the employee of $1,887.72 ($2,511.72 less $ 624.00), and is clearly not regressive bargaining.

The Safe and Healthy Workplace proposal is not regressive, since the Union agreed to the concept written in Renaissance's lockout letter, and never objected to it after receipt of the lockout letter.

The August 30, 2010 bargaining proposal, which immediately followed the "off-the-record" meeting, is not alleged in the Region's complaint as being regressive, because it is not. The proposal was specifically requested by the Union when it asked Renaissance to give it a proposal that would reduce the number of union members and, therefore, reduce Renaissance's labor costs. The Union got what it asked for—a proposal that Renaissance could live with economically—and then rejected it out-of-hand without making a counter proposal.

32

**b.** **Judge Fish expressed doubt that Renaissance ever insisted that the Union ratify the agreement and, therefore, it cannot be said that there is reasonable cause to believe that the lockout was unlawful.**

The crux of the ratification issue is that the Union claims that Renaissance conditioned its Final Offer on "ratification" of the offer—a permissive bargaining subject. This theory is baseless and Judge Fish even stated that, as to ratification, that "there [was] doubt in [his] mind . . . whether in this case the evidence establishes that . . . [Renaissance] . . . has insisted on that subject (*i.e.*; ratification) as a condition of agreement . . . and whether it automatically taints the lockout . . . ." Tr. 2430. The Board has made it clear that it does not taint the lockout.

The inclusion of a permissive subject in an offer, or final offer, is not fatal. Each party "ha[s] a right to present, even repeatedly, a demand concerning a [permissive] subject of bargaining, so long as it [does] not posit the matter as an ultimatum", *Latrobe Steel Co. v. NLRB*, 630 F.2d 171, 179 (3rd Cir. 1980), nor insist upon the permissive subject as a condition precedent to reaching agreement. *Pleasantville Nursing Home*, 335 N.L.R.B. 961, 964 (2001) (citing, *Union Carbide Corp.*, 165 N.L.R.B. 254, 255 (1967)). It is the insistence, "'in the face of a clear and express refusal'" by the other party to bargain about the permissive subject, that violates Section 8(a)(5) of the Act. *See*, *Pleasantville*, 335 N.L.R.B. at 964. Absent "a clear and express refusal" by the union to bargain about the permissive subject, an employer's inclusion of that subject in its *Final Offer* does not constitute unlawful insistence. *Union Carbide Corp.*, 165 N.L.R.B. 254, 255 (1967), affd. sub nom. *Oil, Chemical and Atomic Workers Local 3-89 v. NLRB*, 405 F.2d 1111 (D.C. Cir. 1968) (complaint dismissed where union did not oppose employer's injection of permissive subject until its inclusion in employer's *Final Offer*, four weeks after the issue was first presented).

Renaissance first presented the Union with its Final Offer on September 1, 2010, in which it stated that the agreement would run for two years from its ratification, and did not modify the terms of that offer, except to add two items agreed upon during subsequent negotiations. Further, Renaissance attached a copy of the Final Offer to its November 18, 2010 lockout notice, and expressly stated that, "effective November 29, 2010 Renaissance will be locking out all bargaining unit employees until such time as a new agreement is ratified. It is undisputed that the Union never requested clarification of the use of the term "ratification" in the Final Offer, or the November 18 lockout notice.

The parties stipulated at hearing that the issue of ratification was never raised by the Union or discussed at all by the parties during negotiations. Despite this stipulation, the Region argues, however, that Renaissance's lockout was unlawful because it was conditioned upon "ratification" of the Final Offer, the idea being that ratification is a permissive subject which cannot be insisted upon as a condition to an agreement. This argument is faulty at its core. The Union had the Final Offer, which included the ratification language, since September 1, 2010 and never once raised the "ratification issue". Moreover, the Union had the November 18, 2010 lockout notice for **eleven days** prior to the actual lockout and never once, in the face of a possible lockout, contacted Renaissance to discuss ratification, nor did the Union make any inquiry as to ratification after the commencement of the lockout. Indeed, had the Union held a *bona fide* concern about the Final Offer having to be ratified and/or its members being locked out as a result of the ratification requirement, the Union could have simply picked up the phone or emailed and asked for clarification, as Raab and the other Union attorneys/representatives had done countless times as to other issues during negotiations.

34

Simply put, under existing law, it cannot be said that Renaissance "insisted" on ratification as a condition to either avert or end the lockout and, therefore, the Region cannot establish that there is reasonable cause to believe a violation of Section 8(a)(5) of the Act has been committed here.

c.    **Renaissance had a contractual right to subcontract and, even assuming that it did not, the Union did not request bargaining or file a grievance, nor did any bargaining unit employee suffer any detriment from Renaissance's increases in subcontractors.**

Renaissance has a contractual right to utilize subcontractors to perform renovations and major repairs (which could include some minor bargaining unit work) per the clear and unambiguous provisions in the parties' 2006-2010 Rider. The Region and Union's assertion that the provision above includes an "unwritten" distinction between work performed in occupied versus unoccupied units was not borne out on the record. The record clearly established that Renaissance has been hiring outside contractors to perform major repairs and substantial renovations at the property in occupied and vacant apartments since purchasing Flatbush Gardens, and the Union has never once raised this as an issue.[11]

Moreover, under existing law, an employer is not obligated to bargain over a decision to subcontract unit work if the decision would have no substantial, significant, or material effect on the employees' terms and conditions of employment. *Louisiana-Pacific Corp.*, 312 N.L.R.B. 165, 166 (1993) and *Westinghouse Electric Corp.*, 153 N.L.R.B. 443, 446–47 (1965) (no violation where employees suffered no ''significant detriment'' as a result of subcontracting unit work). Here, even assuming, *arguendo,* that Renaissance unilaterally subcontracted bargaining

---

[11] Notably, the Union and Flatbush Gardens signed a Memorandum of Agreement ("MOA") in or around March 2008 wherein they confirm that they "further agree to modify Paragraph 3 (Subcontracting) of the 2006-2010 Rider to the CBA to clarify that any employees of the Employer who perform renovation and major repairs at the property are now, and have been at all times, excluded from the scope of the CBA . . . ."

unit work, the record is clear that not one bargaining unit employee suffered any substantial, significant or material effect in his terms or conditions of employment. No employee was laid off, terminated, or otherwise had their hours reduced. This is confirmed by the Union's lack of any grievance associated with Flatbush Gardens' use of subcontractors since 2008. Further, Renaissance's increase in the use of subcontractors was caused by the increase in HPD violations in large part instigated by the Union.

### d.    The requested relief is not just and proper.

In the Second Circuit, 10(j) relief is "just and proper" only when absolutely necessary to preserve or restore the status quo "as it existed before the onset of unfair labor practices," *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975), or to prevent irreparable injury because the employer's alleged actions "threaten to render the Board's processes 'totally ineffective' by precluding a meaningful final remedy." *Keynard v. Mego Corp.*, 633 F.2d 1026, 1034 (2d Cir. 1980) (*quoting Trading Port*, 517 F.2d at 38). Additionally, as with any injunctive relief, "general equitable principles" must be applied in deciding the propriety of a Section 10(j) injunction. *Silverman v. 40-41 Realty Assocs., Inc.*, 668 F.2d 678, 680 (2d Cir. 1982); *Mego Corp.*, 633 F.2d at 1033. Where there are no "special circumstances" that require the court's intervention in order to prevent any irreparable harm, the Second Circuit should deny the requested relief. *See e.g., McLeod v. General Elec. Co.*, 366 F.2d 847, 850 (2d Cir. 1966), judgment set aside on other grounds, *McLeod v. General Elec. Co.*, 385 U.S. 533 (1967).

Interim relief is not just and proper here. First, while Renaissance does not believe that injunctive relief is warranted based upon the foregoing and below analyses, it has offered to reinstate the locked out employees, subject to the decision from Judge Fish, at wages, benefits and certain terms that were set forth in Renaissance's Final Offer. Thus, should Petitioner accept

36

Renaissance's offer, there will be no need for injunctive relief.[12]   Second, Petitioner's specific claims noted it its brief are rooted in clearly distinguishable cases, in direct contradiction to existing Board law, and unfounded assertions.  (Petitioner Br. at pgs 19-22, 23-24).

    i.    ***Support and the collective bargaining process.***

The alleged unfair labor practices herein do not lend themselves to loss of support for the Union.  The Union remains the certified bargaining representative and the locked out employees are still members of the Union and will continue to be once the lockout ends.  Moreover, any new employee hired after the lockout ends will be part of the bargaining unit.  Petitioner's cited cases involve employer conduct that had a significant impact upon the level of union support because they either affected **a newly established bargaining relationship and/or attempted to sever an existing bargaining relationship through withdrawing recognition from the Union**. *See Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011) (withdrawing recognition from union); *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001) (refusing to hire employees in order to avoid unionization); *Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652 (9th Cir. 2001) (engaging in conduct before election of union); *Moore-Duncan v. Horizon House Dev. Services.*, 155 F. Supp.2d 390 (E.D. Pa 2001) (withdrawing recognition from union after two years of representation by the union); *Asseo v. Pan Am. Grain Co., Inc.*, 805 F.2d 23 (1st Cir. 1986) (bargaining unit was newly certified); and, *Morio v. North Am. Soccer League*, 632 F.2d 217 (2d Cir. 1980) (refusing to bargain with a newly certified union).  These cases represent employers who sought to undermine support for the union in an attempt to impair the collective bargaining process.  These facts are not present herein.

---

[12] As of the drafting of this Memorandum, Petitioner has not informed Renaissance of its position with respect Renaissance's offer of reinstatement.

The facts here more closely align with the Third Circuit's view that interim relief should be denied where the harm from the alleged unfair labor practices is either of minimal consequence or outweighed by the resulting harm to the integrity of existing collective bargaining agreements. *Kobell v. Beverly Health and Rehab. Srvcs., Inc.*, 987 F. Supp. 409, 415 (W.D. Pa. 1997). Thus, as noted in Petitioner's cited *Horizon House* case, if the alleged unfair labor practice "is against an established, small and intimate bargaining unit, improper attempts by management to impair the collective bargaining process will have minimal chilling effect because the employees will most likely, be fully aware of their rights under the NLRA." *Horizon House*, 155 F. Supp.2d at 397 (citing, *Pascarell v. Vibra Screw*, 904 F.2d 874, 879 (3rd Cir. 1990)).

For example, in *Kobell v. Suburban Lines*, 731 F.2d 1076 (3rd Cir. 1984), a successor employer refused to hire all 38 of the predecessor employer's employees allegedly as a means of avoiding its obligation to bargain with the union.   All 38 employees had been represented by the same union for 14 years. *Suburban Lines*, 731 F.2d at 1079-82. The court denied the injunction, finding that such a cohesive and established bargaining unit could "swiftly and effectively reconstitute itself", and there was no real concern that the established members of the bargaining unit would be deterred from rejoining the union. *Id.* at 1093.

Here, the facts supporting the "small and intimate" exception are equally as compelling as *Suburban Lines*.  First, Renaissance's bargaining unit consists of approximately seventy (70), slightly more than that in *Suburban Lines*.  Second, all employees of the bargaining unit work in East Flatbush Brooklyn and are not "scattered among" several locations.  *See Horizon House*, 155 F. Supp.2d at 397 (finding no intimacy and granting the injunction because, while the unit size was small, the employees were scattered among several different locations).   Third, the

longevity of the Union's representation of the bargaining unit goes back for many years beyond that of Renaissance's ownership.    This is more than the length of time as the union's representation in *Suburban Lines* (14 years) and there have been more contracts between the parties than there was in *Horizon House*. *See, e.g. Vibra Screw*, 904 F.2d at 881 (finding no intimacy because the union had recently been certified); and *Horizon House*, 155 F. Supp.2d at 397 (finding no intimacy because there was only one contract negotiation since certification).

Petitioner also asserts, incorrectly, that there will be a drifting away of the Union's membership and a debilitation of the Union's bargaining vigor. (Petitioner Br. at pg. 21).  First, the Union's membership is not going anywhere.  The Union is the bargaining representative of the building service employees at Flatbush Gardens and will remain the bargaining representative after the lockout ends.  Second, as to the Union's bargaining vigor, the Union has not displayed that, despite it having a duty under the law, to request bargaining from Renaissance.  Since the lockout the Union has failed to request from Renaissance even one date in which to bargain.  Thus, for more than 14 months the Union has slumbered on its rights.

Finally, Petitioner requests that this Court restore the subcontracted bargaining unit work, yet the work that has been subcontracted was not bargaining unit work and the parties' negotiated language makes this clear.

###        ii.      *Irreparable harm to the employees.*

Petitioner states that absent prompt reinstatement locked out employees who are also residents at Flatbush Gardens may face eviction proceedings for failure to pay rent. (Petitioner Br. at pg. 23).  This argument is baseless.  Renaissance has ceased all eviction proceedings against any locked out employee who is also a resident at Flatbush Gardens and will not pursue—during the pendency of the proceedings before Judge Fish—any new eviction proceedings against any locked out employees who are also residents at Flatbush Gardens.

Petitioner also asserts that the health and welfare fund will provide healthcare coverage for locked out employees only through January 31, 2012 and that a final Board order cannot fully remedy the harm to employees who are currently unable to afford adequate medical treatment. *Id.* Petitioner has failed to present any evidence of the foregoing or how many employees may actually be affected by the allegations. Petitioner further claims that employees may have to postpone or forego treatment, but Petitioner has failed to recognize that the relief it seeks is equitable in nature and can be obtained through New York's Hospital Financial Assistance Law, codified at §2807-k(9-a) of the New York Public Health Law. (http://hospitals.nyhealth.gov/psa. php?view=summary&PHPSESSID=60f18e69a93f4e05e42ddca0a76f4ba6)    (last    visited    on January 29, 2012).

Finally, Petitioner notes that the locked out employees have been collecting unemployment insurance benefits and that these benefits are set to expire on February 29, 2012. (Petitioner Br. at pg. 9). This is an incorrect statement, because the "maximum number of weeks of unemployment benefits available to claimants in New York State is 93." (http://labor.ny.gov/stats/pressreleases/pruistat.shtm) (last visited January 29, 2012). Thus, even assuming the locked out employees received unemployment for the first time on December 1, 2010, February 29, 2012 would represent only 65 weeks, and therefore the locked out employees would be eligible to receive benefits until September 12, 2012. These unemployment benefits will also allow the employees to obtain health insurance coverage by either paying for coverage from one of the Union's many different health plans that it offers members or by purchasing coverage from other sources, whether that coverage be public or private; not to mention there may be employees who may very well be covered by a spouse's health insurance plan.

### iii.   *Harm to Renaissance and its replacement employees.*

The harm to Renaissance will be significant and detrimental.   Reinstating locked out employees to the wages and benefits that existed at the time of the lockout is punitive in nature, not remedial as the Act requires.   That is, Renaissance had maintained its position throughout bargaining that it needed to reduce its operating costs, not increase them.   Upon commencement of the lockout, Renaissance paid a fair wage that enabled it to continue operating.   It would not have been able to continue operating if it had to continue paying the wages and benefits as provided for in the contract—hence, its proposal all along to reduce wages and benefits.   If Renaissance is required to reinstate employees at the wages and benefits that existed prior to the lockout, it may very well cease to exist altogether.   To this end, should this Court order reinstatement, it is urged to do so at the wage and benefit rates provided for in Renaissance's Final Offer or require the Union to post a bond in the amount equal to the difference between the current wage and benefit package offered to temporary employees versus the wage and benefit package the locked out employees received prior to the lockout, because Renaissance will never be able to recoup that money in the event Judge Fish rules in Renaissance's favor.   *See Blyer v. Unitron Color Graphics of New York, Inc.*, 1998 WL 1032625 (E.D.N.Y. 1998) (requiring the posting of a bond pending the final disposition of the administrative matters).

This Court must also be mindful of the replacement employees who have been servicing the tenants at Flatbush Gardens for more than 14 months.   Should this Court order reinstatement of the locked out employees, such an order would effectively terminate the employment of the 70 employees now working for Renaissance at Flatbush Gardens.

### iv.   *Passage of time.*

The Board has a "relatively high hurdle" it must clear to establish that its significant delay in completing the investigation—nine months—and its failure to petition the Court for

injunctive relief in the five months since issuance of the Complaint, a total of 14 mnoths, will frustrate the Board's ability to remedy the alleged unfair labor practices. *Parents in Cmty. Action*, 172 F.3d at 1039; *Mego Corp.*, 633 F.2d at 1034; and, *Kaynard v. Lawrence Rigging, Inc.*, 1972 WL 803 at *5 (E.D.N.Y. 1972). The Union filed the initial charge in the underlying matter prior to the lockout. The Region then conducted an investigation that took nearly nine months to complete. If the Region truly believed that this case was of such extreme importance so as to require injunctive relief, it would have exercised its right to request that the Board authorize the injunctive filings much sooner than 14 months after the start of the process. If there ever was a case for applying the doctrine of laches, this is it.

This Court must be mindful that the remedy the Board seeks, reinstatement, is equitable in nature. Thus, because there is an adequate remedy at law available to Petitioner; namely, an order requiring the reinstatement of the locked out employees and payment of backpay and benefits, the Board cannot establish that its request for injunctive relief is somehow "just and proper."

## V.   **CONCLUSION**

For all the above reasons, Renaissance respectfully requests that this Court deny the Petition.

Respectfully submitted,


_____/s/ Brian A. Caufield_____
Stanley L. Goodman (SG/7179)
Brian A. Caufield (BC/5673)
Attorney for Respondents
Renaissance Equity Holdings, LLC and
Renaissance Equity Holdings, LLCs A through G
Fox Rothschild LLP
75 Eisenhower Parkway, Suite 200
Dated:  January 31, 2012.                    Roseland, New Jersey 07068

# Exhibit

# A



**Fox Rothschild** LLP
ATTORNEYS AT LAW

75 Eisenhower Parkway, Suite 200
Roseland, NJ 07068-1600
Tel 973.992.4800  Fax 973.992.9125
www.foxrothschild.com

Stephen A. Ploscowe, Esq.
Direct Dial:  973-994-7500
E-Mail:  sploscowe@foxrothschild.com

January 30, 2012

James G. Paulsen, Regional Director
Region 29, NLRB
Two Metro Tech Center – Suite 5100
Brooklyn, New York 11201

Re:    **Paulsen v. Renaissance Equity Holdings, LLC et als.**

Dear Mr. Paulsen:

The return day of your Order to Show Cause requesting 10(j) relief against our client is currently scheduled for February 2, 2012.

On behalf of our client, we propose the following settlement of the 10(j) proceeding:

1.    Reinstate the 32BJ members who elect to return to work under the following proposals set forth in my client's Best and Final Offer pending and subject to the decision of Stephen Fish, the Administrative Law Judge:

    a.    Article V Arbitration which was agreed upon by the parties.

    b.    The <u>Wage</u> section of the Best and Final Offer including paragraphs a,b, and 2(a), 2(c), 4, 5 7.

    c.    Sick Days, paragraph 36.

    d.    Health and Pension, paragraph 40, all sections except the Section 125 Cafeteria Plan opt out proposal.

2.    We will have to work out the exact timing of an orderly reinstatement of the 32BJ members who elect to be reinstated.

A Pennsylvania Limited Liability Partnership

James G. Paulsen, Regional Director
January 30, 2012
Page 2

    3.    My client will terminate at this time the pending eviction proceedings against 32BJ members, but will expect them to work out with management a reasonable plan to recommence their rental payments.

We believe this is a reasonable resolution that will end any alleged irreparable harm to the employees. Obviously, if my client should lose the ULP proceeding, the Judge's make whole remedy will make up any differences in pay and/or benefits.

If you would like to discuss this with me, please use my cell telephone this week: 201-310-2656

Very truly yours,

FOX ROTHSCHILD LLP

*Stephen A. Ploscowe*

Stephen A. Ploscowe

SAP/df

cc:    Flatbush Gardens
       Emily A. Cabrera, Esq.
       Tara A. O'Rourke, Esq.
       Aggie Kapelman, Esq.