UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                                         :
JAMES G. PAULSEN, Regional Director of                   :
Region 29 of the National Labor Relations Board,         :
                                                         :
                              Petitioner,                :
                                                         :
            - against -                                  :       **MEMORANDUM DECISION**
                                                         :
RENAISSANCE EQUITY HOLDINGS, LLC                         :       12 Civ. 0350 (BMC)
RENAISSANCE EQUITY HOLDINGS, LLC A                       :
RENAISSANCE EQUITY HOLDINGS, LLC B                       :
RENAISSANCE EQUITY HOLDINGS, LLC C                       :
RENAISSANCE EQUITY HOLDINGS, LLC D                       :
RENAISSANCE EQUITY HOLDINGS, LLC E                       :
RENAISSANCE EQUITY HOLDINGS, LLC F                       :
RENAISSANCE EQUITY HOLDINGS, LLC G                       :
Collectively d/b/a FLATBUSH GARDENS,                     :
                                                         :
                              Respondents.               :
                                                         :
                                                         :
-------------------------------------------------------- X

**COGAN**, District Judge.

Petitioner James G. Paulsen is a Regional Director of the National Labor Relations Board

("N.L.R.B." or "the Board"). He brings this proceeding pursuant to § 10(j) of the National Labor

Relations Act, which allows the N.L.R.B. to petition a district court for injunctive relief pending

administrative review of an unfair labor practices charge. See 29 U.S.C. § 160(j). Respondent

Renaissance Equity Holdings, LLC ("Renaissance") opposes injunctive relief and moves to

dismiss the petition, arguing that President Obama's recent appointments to the Board were

unconstitutional and the Board therefore lacks the threshold number of members needed to

petition this Court. For the reasons stated below, Renaissance's motion to dismiss is denied and

petitioner's request for an injunction is granted in part and denied in part.

## BACKGROUND

### I.

Renaissance owns and operates Flatbush Gardens, a 59-building complex in the East Flatbush section of Brooklyn, New York, that consists of approximately 2,500 rental apartments. Many of the apartments are rent-stabilized or low-income housing. Service Employees International Union Local 32BJ (the "Union") represents more than 70 porters, handymen, and boilermen employed by Renaissance at the Flatbush Gardens complex. Following a protracted dispute between Renaissance and the Union over the terms of a Collective Bargaining Agreement ("CBA"), Renaissance instituted a lockout against its unionized employees. In turn, the Union filed a charge of unfair labor practices against Renaissance with the N.L.R.B. Petitioner seeks a preliminary injunction from this Court forcing Renaissance to reinstate the unionized workers pending the N.L.R.B.'s final adjudication of the labor dispute.

The most recent CBA between the Union and Renaissance expired on April 20, 2010. Prior to this CBA's expiration, Renaissance began signaling a willingness to begin negotiating a new CBA. The Union, however, was busy negotiating with the Realty Advisory Board ("RAB"), which is a large multiemployer association that bargains with the Union on behalf of many local residential owners. The Union did not want to begin negotiating with Renaissance until it had finalized its agreement with the RAB.

In late May, 2010, Renaissance contacted the Union and expressed an urgent financial need to negotiate a new CBA that would allow Renaissance to cut costs. Negotiations began in June, and the parties conducted between six and ten official bargaining sessions across the next three months. At the first official bargaining session, Renaissance reiterated that it was losing money and demanded: 1.) a 30-40% wage reduction; 2.) that healthcare coverage be limited to

full-time employees only; and 3.) the unilateral right cut employees' hours, lay off employees, convert employees from full-time to part-time, and subcontract out union work. Renaissance insisted that these measures were necessary because it was losing millions of dollars per year. When Renaissance presented its last, best, and final offer (the "LBFO") three months later, each of these terms remained untouched except Renaissance's healthcare provision. (The parties dispute whether the healthcare provision in the LBFO was better or worse than Renaissance's initial healthcare provision.)

Despite Renaissance's pleas of financial hardship, it is undisputed that the Union did not agree to or make a counteroffer that would encompass any decrease in wages. Throughout most of the time that the parties actively bargained, the Union appears to have taken a hardline stance on increased wages and benefits. The Union had achieved an increase in wages in its agreement with the RAB, and therefore insisted that Renaissance meet these "industry standards." (Renaissance is not a member of the RAB.) There is a "Most Favored Nations Clause" in the Union's contract with the RAB, which would have generally required the Union, absent a waiver from the RAB, to lower the wages of all workers falling under the RAB agreement if the Union had acceded to Renaissance's request for lower wages.

Over the course of bargaining, the Union generally accepted Renaissance's contention that it was operating at a loss but insisted on reviewing Renaissance's books to determine the extent of the losses.[1] The Union's unfair labor practice charges against Renaissance stem in large part from Renaissance's alleged bad-faith response to the Union's request for proof of financial distress. Specifically, the Union alleges that Renaissance failed to provide certain

---

[1] At oral argument in this case, the Union's counsel argued that "it's not agreed . . . and it's never been agreed" that Renaissance is losing money. This position is contradicted by the record. For example, the Union's chief negotiator, Ron Raab, testified before the ALJ that he "acknowledged," at a bargaining session with Renaissance, "that they were incurring a loss . . . [although he] wasn't sure how great the loss was."

documents that the Union needed to substantiate Renaissance's claims of financial distress and provided misleading documents that understated Renaissance's profit margins.

It is undisputed that Renaissance quickly agreed to let the Union review its books at Renaissance's offices. The Union sent its Director of Finance and Administration, George Reis, to Renaissance's offices for two financial review sessions. At the first session, on July 27, 2010, Reis spent between two and four hours at Renaissance. According to petitioner, he was given access to the general ledgers for the years 2007-2010; general payroll records; and invoices of payments made to vendors. At this meeting, Reis requested audited financial statements and detailed payroll records, but he was told that such documents did not exist because Renaissance does not prepare audited financial statements and has an outside vendor prepare payroll.

After this meeting, Reis, who is a Certified Public Accountant, informed the Union that the information provided by Renaissance showed that Renaissance was suffering economic losses. He also informed the Union that he still had several unanswered questions regarding Renaissance's finances and that he had been unable to conduct a thorough assessment without access to audited financial statements or detailed payroll records. The Union and Reis decided to seek tax returns from Renaissance in lieu of audited financial statements.

On August 19, 2010, Reis went back to Renaissance and again spent a few hours at the office. The parties dispute whether, and to what extent, Renaissance's tax returns were made available to Reis during this meeting. According to petitioner, Reis asked for recent tax returns and was informed that he could not view any full tax returns because the returns contained confidential information regarding entities other than Renaissance. Instead, he was given a one-page summary of a tax return from 2008 and was not permitted to make copies of this document

or any of the other documents that he viewed during either review session at Renaissance's offices.

At the second bargaining session, Renaissance provided the Union with a one-page "Statement of Operations" allegedly prepared by its accounting firm based on a review of Renaissance's books and records. The Statement of Operations lists Renaissance's income and expenses for the years 2007, 2008, and 2009. This statement shows multi-million dollar losses in each of the three years, totaling a $28,812,284 loss over three years. The statement contains no information as to how each number was reached, and petitioner claims that some of the figures proved to be false or misleading. For example, the Statement of Operations listed Renaissance's rental income for the year 2009 to be $25,809,836. However, documents submitted by Renaissance in furtherance of a loan modification application showed rental income that is nearly one million dollars greater. Petitioner also argues that the Statement of Operations inaccurately inflated the amount of expenses paid by Renaissance in 2008. Although the Statement of Operations listed expenses in the amount of $3,941,713, the loan modification application lists only $682,982. According to Renaissance, these discrepancies arose because the loan modification application consisted of projected income and expenses, whereas the Statement of Operations listed actual income and expenses.

Petitioner also notes that Renaissance's tax return for 2007, obtained during discovery, showed a property sale of $28,391,653 and a distribution to Renaissance's partners for the same amount. Petitioner argues that a $2.4 million gain was realized from the sale of this property but was excluded from the Statement of Operations. Renaissance claims that this money was derived from a sale of property that was wholly unrelated to Renaissance. According to Renaissance, some of its partners used this "1031 exchange" (see 26 U.S.C. § 1031) to avoid

paying taxes on the sale of the unrelated property, and the $28 million merely reflected a pass-through transaction.

In July, 2010, the Union made a written request for copies of the general ledgers. In response to this request, Renaissance provided four pages of unaudited, uncertified financial summaries. According to petitioner, the Union was unable to verify these summaries without copies of the general ledgers and tax returns. During a hearing in front of the Administrative Law Judge ("ALJ") whom this labor dispute is currently before, Renaissance's accountant explained that one of these four pages (the "Balance Sheet Comparison") did not cover the entire complex, as the Union had believed, but only 60% of the complex's operations. It is undisputed that Renaissance refused to furnish the Union with copies of the general ledger.

At the hearing before the ALJ, Reis testified that the documents provided by Renaissance did not allow him to meaningfully assess Renaissance's financial condition. Walter Pocalyko, a Forensic Accountant hired by the Union to review Renaissance's books, testified that the Statement of Operations "contained material misstatements and inaccuracies and omitted significant financial data that was relevant to the analysis of the operations at Renaissance."

Petitioner also alleges that Renaissance engaged in unfair labor practices by unilaterally subcontracting out bargaining-unit work. Part of the CBA provides that "renovation and major repair work" can be subcontracted out and is not union work. Minor repairs, however, are to be performed by Union employees. According to petitioner, Renaissance clandestinely subcontracted out minor repair work in September, 2010.

Renaissance explains that it subcontracted out Union work when attempting to clear housing code violations issued by the New York City Department of Housing Preservation and Development ("HPD") during a procedure known as a "mass dismissal request." When an

employer makes a mass dismissal request, the entire building is inspected by HPD at once in order to remove as many violations as possible. According to Renaissance, it "does not take chances" during a mass dismissal request, and brings in subcontractors to clean up "anything and everything" at once.

In August, 2010, one of Flatbush Gardens' principals was placed on a "Worst Landlord Watch List" created by New York City's Public Advocate. Renaissance became concerned and asked subcontractors to expedite the process of removing the HPD violations in order to be removed from the list. Renaissance argues that "using these contractors was seen as being the fastest way to achieve the goal of getting off the list." Renaissance also argues that the Union did not object to or file a grievance about the subcontracting until the lockout and that none of the bargaining-unit employees were terminated or had their employment terms modified in order to accommodate the subcontractors.

Petitioner also alleges that Renaissance engaged in bad-faith bargaining by making regressive demands and refusing to accept reasonable compromises offered by the Union. At an off-the-record bargaining session at the end of August, 2010, the Union offered to decrease the number of required bargaining-unit employees, such that Renaissance could pay fewer employees at the RAB rates. Although it is undisputed that the parties could not agree on the number of employees to slash – the Union proposed cutting 10, whereas Renaissance proposed cutting 60 – the parties dispute whether it was the Union or Renaissance that closed the door on these negotiations. At the next bargaining session, on September 1, 2010, Renaissance presented its LBFO.

Following tender of the LBFO, the Union repeatedly asked Ploscowe to schedule additional bargaining sessions. Ploscowe insisted that the parties were "at impasse" and would

not schedule bargaining sessions unless the Union made legitimate cost-cutting offers. On September 8, 2010, the Union suggested an alternative proposal which would entail Renaissance hiring bargaining-unit employees to replace subcontractors who were doing renovation work. Ploscowe analyzed the proposal and rejected it via email, asserting that the proposal would actually cost Renaissance more money over the long run.

Toward the very end of the active bargaining period, following Renaissance's LBFO, the Union proposed a one-year wage freeze. After the one year, wages would increase yearly at the rates outlined in the RAB. In other words, the wages would go up by the same yearly increment as in the RAB, but the total wages would always be less than the RAB wages. The Union indicated that this proposal was contingent on obtaining a waiver of the Most Favored Nations Clause in the RAB agreement. Renaissance agreed to have a bargaining session on October 19, 2010, but rejected this wage-freeze proposal and continued to insist on every term presented in the LBFO. From notes taken by Stephen Ploscowe, Renaissance's labor counsel, it appears that Renaissance's decision to reject this wage freeze proposal was solidified before the bargaining session began.

Renaissance served the Union with a notice of lockout on November 18, 2010, which informed the Union that the lockout would begin on November 29, 2010, unless the unionized employees "ratified" the LBFO. A similar notice was sent to the employees. Having heard nothing from the Union by November 29, Renaissance instituted the lockout. Although it is undisputed that this issue was never raised until the Union filed unfair labor practice charges against Renaissance, the Union now argues that Renaissance's insistence on ratification rendered the lockout unlawful. On November 22, 2010, the Union filed a charge of unfair labor practices with the N.L.R.B. The lockout commenced on November 29, 2010, and continues to this day.

Petitioner argues that Renaissance's actions are vastly eroding Union support; undermining the employees' collective bargaining rights; and putting the employees at risk of losing health care and being evicted.  Petitioner therefore seeks an injunction:

1.) **Restraining Renaissance from**:

    a.  Conditioning the terms of the lock-out upon the ratification of the LBFO;

    b.  Subcontracting out unionized employees' work;

    c.  Failing and refusing to bargain in good faith with the Union; or

    d.  Otherwise interfering with the unionized employees' rights to bargain collectively.

2.) **Forcing Renaissance to:**

    a.  Reinstate all unionized employees to their former terms and conditions of employment;

    b.  Restore all subcontracted work to the unionized employees; and

    c.  Bargain in good faith with the Union.

## II.

Renaissance moves to dismiss the petition, arguing that the Board lacks a quorum and therefor may not initiate § 10(j) proceedings.  Some background on President Obama's recent appointments to the N.L.R.B. is necessary to explain Renaissance's motion.  In January of this year, Craig Becker's term as Board member on the N.L.R.B. expired and the Board was left with two remaining members.  The Board, which has a capacity for five members, is statutorily required to maintain a quorum of three members and may not validly act when its membership

dips below three. As a result of this quorum requirement, the expiration of Becker's term left the Board hamstrung.

Ordinarily, the President's appointments to the N.L.R.B. must comport with Article II, Section 2, Clause 2 of the Constitution, which allows the President to appoint officers of the United States only after receiving the "advice and consent" of the Senate. When Becker's term expired, however, one of President Obama's nominees to the Board had been languishing in the Senate for months without receiving confirmation. Although the President has the power, under Article II, Section 2, Clause 3 of the Constitution, to appoint officers without Senate confirmation while the Senate is in recess, the Senate had been conducting "*pro-forma*" sessions every three days in order to block the President from exercising his recess appointment power. To sidestep the confirmation process, President Obama took the controversial step of exercising his recess appointment power while the Senate was still conducting "*pro-forma*" sessions.

Pursuant to his recess appointment power, the President appointed three Board members – Sharon Block, Terence F. Flynn, and Richard Griffin – ostensibly bringing the Board's membership up to five. According to Renaissance, however, the Board's membership currently consists of only two validly-appointed members because the Senate was technically in session when the recess appointments were made and the appointments were thus unconstitutional. Renaissance argues that the petition must therefore be dismissed because the Board lacks its statutorily-required quorum and does not have authority to petition this Court for relief.

Petitioner maintains that the Senate was not actually in session and President Obama's recess appointments were constitutional. But this argument is secondary to petitioner's assertion that this Court need not determine whether the Board has a quorum because the Board validly delegated its powers to petition for injunctive relief to the General Counsel of the N.L.R.B.

Anticipating that the expiration of Becker's term would leave the Board without a quorum, the

Board published an "Order Contingently Delegating Authority to the General Counsel" in the

Federal Register on November 9, 2011.  The order reads as follows:

> The [N.L.R.B.] anticipates that in the near future it may, for a temporary period,
> have fewer than three Members of its full complement of five Members. The
> Board also recognizes that it has a continuing responsibility to fulfill its statutory
> obligations in the most effective and efficient manner possible.  To assure that the
> Agency will be able to meet its obligations to the public to the greatest extent
> possible, the Board has decided to temporarily delegate to the General Counsel
> full authority on all court litigation matters that would otherwise require Board
> authorization . . . . This delegation shall be effective during any time at which the
> Board has fewer than three Members and is made under the authority granted to
> the Board under sections 3, 4, 6, and 10 of the [N.L.R.A.]. *Accordingly, the Board
> delegates to the General Counsel full and final authority and responsibility on
> behalf of the Board to initiate and prosecute injunction proceedings under section
> 10(j) . . . .*

N.L.R.B. – Order Contingently Delegating Authority to the General Counsel, 76 Fed. Reg.

69768, 697768 (Nov. 9, 2011) (emphasis added).

Renaissance argues that the Board cannot delegate its § 10(j) powers to the General

Counsel and that, even if it could, this particular delegation is invalid because it does not take

effect until the Board's membership falls below a quorum.  Renaissance further argues that this

Court must decide the constitutional issue regardless of whether the Board validly delegated its

§10(j) powers to the General Counsel.

## DISCUSSION

### I.

In 1947, Congress passed the Labor Management Relations Act (popularly known as the

Taft-Hartley Act), which amended the N.L.R.A.  See Pub. L. No. 80-101, § 3(a)-(b), 61 Stat.

136, 139 (1947).  The purpose of the Taft-Hartley Act (the "Act") was to expand the N.L.R.B.

and structure the agency in a way that separated its prosecutorial functions from its adjudicative functions.  See NLRB v. United Food & Commercial Workers Union, Local 23, 484 U.S. 112, 117-118, 108 S. Ct. 413 (1987).  To achieve these ends, the Taft-Hartley Act established the position of General Counsel for the N.L.R.B.; increased the size of the Board from three members to five; increased the Board's quorum requirement from two to three; and allowed the Board to adjudicate cases in panels by delegating its authority to three-member groups empowered to act with a quorum of two members.  See 29 U.S.C. § 153(b).

The Taft-Hartley Act also gave the N.L.R.B. the ability to petition a district court for injunctive relief pending administrative review of charges of unfair labor practices.  Section 10(j) states that the "Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court . . . for appropriate temporary relief."  29 U.S.C. § 160(j).  Although § 10(j) grants this power to "the Board," the Taft-Hartley Act also states that the General Counsel has "final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, *and shall have such other duties as the Board may prescribe* or as may be provided by law."  29 U.S.C. § 153(d) (emphasis added).

Immediately following the passage of the Taft-Hartley Act, the Board and the General Counsel entered into an unpublished "memorandum of understanding" under which the General Counsel had complete authority to initiate and prosecute injunctions pursuant to § 10(j).  See Evans v. Int'l Typographical Union, 76 F. Supp. 881, 888 (S.D. Ind. 1948).  This practice lasted until 1950, when the Board published a memorandum in the Federal Register explaining that the General Counsel had to seek Board approval before initiating injunctions under §10(j).

N.L.R.B., General Counsel – Description of Authority and Assignment of Responsibilities, 15
Fed. Reg. 6924, 6924 (Oct. 14, 1950). This memorandum set forth the Board's general practice
from 1950 on. According to the General Counsel's § 10(j) manual, the typical procedure is for
the Regional Director to initiate the § 10(j) process by making a recommendation in writing to
the General Counsel, who requests authorization from the Board if "the General Counsel agrees
that § 10(j) proceedings should be brought." N.L.R.B. Office of the General Counsel, Electronic
Redacted § 10(j) Manual § 5.2 (2002).[2] If the Board grants authorization, the Regional Director
files the § 10(j) petition in federal district court. See id. § 5.5.

Since 1950, the Board has delegated its power to authorize § 10(j) petitions to the
General Counsel at various times that the Board anticipated losing its quorum. The first of these
delegations was in 1993. See N.L.R.B. – Order Delegating Authority to the General Counsel, 58
Fed. Reg. 64340, 64340 (Dec. 6, 1993). The Board subsequently made similar delegations in
2001, 2002, 2007, and again in November of 2011. It is the November, 2011, delegation that
Renaissance challenges in the instant case.

Renaissance argues that the Act gives the power to petition for § 10(j) relief exclusively
to "the Board," and that the Board may not delegate this power to the General Counsel.
Renaissance further argues that, even if the Board may delegate its § 10(j) powers to the General
Counsel in the ordinary course, such a delegation would not survive the Board's loss of a
quorum.

## A. The Board's Ability to Delegate its § 10(j) Powers

When asked to interpret a statute governing an administrative agency, the Second Circuit
follows the analytical framework set forth by the Supreme Court in Chevron U.S.A., Inc. v.

---

[2] The redacted manual is available at
http://www.nlrb.gov/sites/default/files/documents/44/redacted_10j_manual_5.0_reduced.pdf. Last visited March 15,
2012.

Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984).  See, e.g., Snell Island

SNF LLC v. NLRB, 568 F.3d 410 (2d Cir. 2009), vacated on other grounds, 130 S. Ct. 3498

(2010).  The Second Circuit describes the Chevron framework as follows:

> At step one, we consider whether Congress has directly spoken to the precise
> question at issue.  If the intent of Congress is clear, that is the end of the matter;
> for the court, as well as the agency, must give effect to the unambiguously
> expressed intent of Congress.  To ascertain Congress's intent, we begin with the
> statutory text because if its language is unambiguous, no further inquiry is
> necessary.  Only if we determine that Congress has not directly addressed the
> precise question at issue will we turn to canons of construction and, if that is
> unsuccessful, to legislative history to see if those interpretative clues permit us to
> identify Congress's clear intent.
>
> If, despite these efforts, we still cannot conclude that Congress has directly
> addressed the precise question at issue, we will proceed to Chevron step two,
> which instructs us to defer to an agency's interpretation of the statute it
> administers, so long as it is reasonable.

N.Y. State Office of Children & Family Servs. v. U.S. Dep't of Health & Human Servs. Admin.

for Children & Families, 556 F.3d 90, 97 (2d Cir. 2009).

Chevron's first step requires this Court to determine whether Congress has "directly

spoken to the precise question at issue," beginning with the statutory text.  Id.  But the Taft-

Hartley Act's text does not unambiguously permit or prohibit delegation of the Board's § 10(j)

powers to the General Counsel.  On one hand, § 3(d) states that the Board can delegate certain

"duties" to the General Counsel and does not rule out any particular kind of duties.  Since the

statute grants significant powers to the General Counsel, such as investigating and prosecuting

complaints of unfair labor practices, it is reasonable to take a broad reading of the word "duties,"

encompassing substantial tasks such as authorizing § 10(j) actions.  See Evans, 76 F. Supp. at

889 ("It is not unreasonable to assume that Congress intended that the Board might delegate to

the General Counsel duties equal in importance with those expressly enumerated.").

This is especially true because § 3(d) gives the General Counsel "final authority" to issue complaints of unfair labor practices and, in the same sentence, gives the General Counsel "such *other* duties as the Board may prescribe." 29 U.S.C. § 153(d) (emphasis added). Congress's use of the word "other" strongly implies that the issuance of complaints was also considered to be a "duty." Since the Act describes the ability to issue complaints as a "power" in § 10(b), Renaissance's assertion that "duties" under § 3(d) are different from a "power" under § 10(j) is not persuasive. Instead, § 3(d) is sensibly read as saying, in effect, "the General Counsel has the power to prosecute complaints of unfair labor practices, and has any other related powers as the Board may delegate." Petitioning for injunctive relief is a task that goes hand-in-hand with investigating and prosecuting an unfair labor practice complaint, and would clearly be covered by the statute under this reading. The text of § 10(j) also lends support to this broad reading because it gives the Board "the power" to petition for injunctive relief but does not mandate any particular procedure. When the Ninth Circuit recently addressed this issue, for example, the Court observed that "[s]ection 10(j)'s silence speaks loudly enough that we might end the matter there." Frankl v. HTH Corp., 650 F.3d 1334 (9th Cir. 2011).

On the other hand, a narrower reading of the Taft-Hartley Act's text could lead to the conclusion that the Board may not delegate its § 10(j) powers to the General Counsel. First and foremost, if Congress had intended to permit the Board to delegate its § 10(j) powers to the General Counsel, it could have done so expressly. For example, § 10(b) discusses the power to issue complaints of unfair labor practices, and grants this power to "the Board, or any agent or agency designated by the Board for such purposes." The Board's ability to delegate this power to the General Counsel is made even more clear by § 3(d), which expressly gives the General Counsel "final authority" over the issuance of complaints. Congress could have treated § 10(j)

the same way, but did not. Furthermore, as Renaissance notes, § 3(b) expressly authorizes the

Board to delegate "any or all of the powers which it may itself exercise" to groups of three or

more Board members, and also authorizes the Board to delegate certain powers to its "regional

directors." 29 U.S.C. § 153(b). Section 3(b) does not say anything about delegations of power

to the General Counsel. A narrow reading of this provision would therefore lead to the

conclusion that the Board may delegate its enumerated powers to groups of three members or the

regional directors, but never to the General Counsel.

Neither the broad interpretation nor the narrow interpretation that I have just described is

unambiguously correct. It thus cannot be said that Congress's intentions are clearly discernible

in the statutory text; Chevron therefore directs this Court to turn to the Act's legislative history.

See Snell, 568 F.3d at 420. A review of this history makes clear that Congress intended to allow

the Board to delegate prosecutorial tasks to the General Counsel while keeping core adjudicative

functions solely in the Board's domain.

As other courts have noted, the Taft-Hartley Act's legislative history evinces the drafters'

intent to create a division between the N.L.R.B.'s prosecutorial functions and its adjudicative

functions. See Local 23, 484 U.S. at 117-118; Evans, 76 F. Supp. at 889. As Senator Taft

explained in a debate on the Senate floor, the position of General Counsel was established "in

order to make an effective separation between the judicial and prosecuting functions of the Board

and yet avoid the cumbersome device of establishing a new independent agency in the executive

branch of the Government." 93 Cong. Rec. 6859 (1947). The General Counsel was therefore

intended to be "completely independent of the Board," and it was by design that the General

Counsel would be appointed by the President rather than selected by the Board. 93 Cong. Rec.

6383 (1947) (remarks of Rep. Hartley). Representative Hartley explained that the General

Counsel "shall be the investigator and prosecutor" on all complaints by employees and "the Board itself will be merely a quasi-judicial board passing on the case as presented by the counsel." Id. In a House debate, Representative Owens asked Representative Hartley why the statute referred to "the Board" in describing certain prosecutorial duties that were within the General Counsel's domain, and Representative Hartley responded: "[t]he reference to the Board was necessary because, in order to have this man independent of the Board, we had to use the term 'Board.' Otherwise we would have had to set up a completely independent agency. . . . He acts on behalf of the Board but is completely independent of the Board." Id.

The comments of the Taft-Hartley Act's drafters go a long way in explaining Congress's intended separation of powers between the Board and the General Counsel. To the extent that the statutory text confuses its readers by granting powers to "the Board" under § 10 and then assigning the same tasks to the General Counsel under § 3, the legislative history shows that the statute took its tortuous structure because its drafters were attempting to graft an independent prosecutorial body onto an existing agency. But despite the Act's occasional opacity, the legislative history clearly demonstrates Congress's intent to place prosecutorial duties within the General Counsel's purview. As many courts have noted, petitioning for a preliminary injunction is a decidedly prosecutorial function. See Frankl, 650 F.3d at 1350; Overstreet v. El Paso Disposal, LP, 625 F.3d 844, 852 (5th Cir. 2010); Muffley ex rel. NLRB v. Spartan Mining Co., 570 F.3d 534, 540 (4th Cir. 2009); Kentov v. Point Blank Body Armor, Inc., 258 F. Supp. 2d 1325, 1328-29 (S.D. Fla. 2002); Evans, 76 F. Supp. at 889. Since petitioning for injunctive relief is not adjudicative in nature – obviously, it is the district court that adjudicates a § 10(j) dispute, not the petitioner – it would have made no sense for the drafters to keep this function strictly within the Board's domain.

Renaissance urges that petitioning for injunctive relief must be an essential Board function because the purpose of a § 10(j) proceeding is "to protect [the] Board's adjudicatory and remedial authority." Many courts agree that the drafters intended § 10(j) to serve this function. See, e.g., Chester ex rel. NLRB v. Grane Healthcare Co., 666 F.3d 87, 97 (3d Cir. 2011); Small v. Avanti Health Systems, LLC, 661 F.3d 1180, 1186 (9th Cir. 2011). But this does not mean that petitioning for injunctive relief (or, more accurately, deciding to petition for injunctive relief) is an adjudicative, rather than prosecutorial, function. Moreover, it does not mean that the Board must authorize all petitions for injunctive relief. The purpose of securing injunctive relief is always to ensure that a final adjudication will be meaningful and will not have come too late; this does nothing to switch the role of the prosecutor and the judge.

Having found that the legislative history evinces Congress's intent to allow the Board to delegate its § 10(j) powers to the General Counsel, my inquiry could end here. See Chevron, 467 U.S. at 843-44 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). However, it is worth noting that I would have reached the same result even if I had determined that Congress's precise intentions were undetectable. If Congress's intent were unclear, Chevron's second step would require me to defer to the N.L.R.B.'s interpretation of the statute, if that interpretation is reasonable. Id. at 844.

Since the passage of the Taft-Hartley Act, the N.L.R.B. has reasonably interpreted the Act to permit delegations of § 10(j) power to the General Counsel. Although the N.L.R.B. has typically required the General Counsel to seek authorization from the Board prior to bringing a § 10(j) petition, it is clear that the N.L.R.B. viewed this procedure as discretionary, rather than mandatory, under the statute. For example, pertinent language in § 10(e) is identical to § 10(j) –

it states that the Board "shall have power" to petition a Court of Appeals for enforcement of a final order – and the N.L.R.B. has always interpreted this language to permit the Board to delegate this power to the General Counsel. Since 1950, the power to petition the Court of Appeals under § 10(e) for enforcement of the Board's orders has been delegated entirely to the General Counsel, who need not seek prior authorization from the Board. See N.L.R.B., General Counsel – Description of Authority and Assignment of Responsibilities, 15 Fed. Reg. 6924, 6924 (Oct. 14, 1950); Frankl, 650 F.3d at 1351 ("The agency's longstanding practice under § 10(e) is therefore persuasive evidence of the legality of its more short-lived and episodic practice under § 10(j)."). Moreover, the N.L.R.B. has delegated its § 10(j) powers to the General Counsel sporadically over the years since the passage of the Taft-Hartley Act. Since the text of the statute is ambiguous and the legislative history clearly demonstrates Congress's intention to relegate prosecutorial functions to the General Counsel, the N.L.R.B.'s longtime interpretation is manifestly reasonable.

## B. Survival of a § 10(j) Delegation Once the Board's Membership Falls Below a Quorum

Having concluded that the Board may ordinarily delegate its § 10(j) powers to the General Counsel, this Court must determine whether a valid delegation was in place when the instant action was brought. Because the November, 2011, delegation was contingent on the Board's membership falling below a quorum, Renaissance attacks this delegation as "springing" and argues that such a delegation "cannot survive the loss of a quorum on the Board" because principles of agency dictate that "an agent's delegated authority terminates when the powers belonging to that entity that bestowed the authority are suspended." For support, Renaissance cites to the D.C. Circuit's opinion in Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB, 564 F.3d 469 (D.C. Cir. 2009).

The reasoning behind Renaissance's argument has been rejected by the Supreme Court and the Second Circuit, as well as the Fifth, Eighth, and Ninth Circuits. Some background on these cases will be helpful to explain the flaw in Renaissance's position.

In 2007, the Board anticipated that its membership would be reduced below a quorum because two of its members' terms were set to expire. The Board therefore made two delegations effective as of midnight on December 28, 2007. See New Process Steel, L.P. v. NLRB, 130 S. Ct. 2635, 2638 (2010). *First*, the Board delegated to the General Counsel continuing authority to initiate § 10(j) proceedings (this part of the 2007 delegation was practically identical to the November, 2011, delegation at issue here). Id. *Second*, the Board delegated "to Members Liebman, Schaumber, and Kirsanow, as a three-member group, all of the Board's powers." Id. The Board expressed the opinion that this delegation would permit the remaining two members to exercise the Board's full powers "after [the] departure of Members Kirsanow and Walsh, because the remaining Members will constitute a quorum of the three-member group." Id. (internal quotation marks omitted).

In the next two years, Liebman and Schaumber decided nearly 600 cases as a two-member Board. Id. at 2639. Many of these decisions were challenged on the ground that the Board lacked the power to adjudicate cases because the delegation to the three-member panel was invalid or lost its validity once the Board lost its quorum. This particular delegation issue was decided by the Second; D.C.; Seventh; First; Fourth; and Tenth Circuits. See Snell, 568 F.3d at 410; Laurel Baye, 564 F.3d at 469; New Process Steel, LP v. NLRB, 564 F.3d 840 (7th Cir. 2009); Northeastern Land Servs., Ltd. v. NLRB, 560 F.3d 36 (1st Cir. 2009); Narricot Indus., LP v. NLRB, 87 F.3d 654 (4th Cir. 2009); Teamsters Local Union No. 523 v. NLRB, 590

F.3d 849 (10th Cir. 2009). Every Circuit except the D.C. Circuit sided with the N.L.R.B. and upheld the delegation.

In Laurel Baye, the D.C. Circuit struck down the delegation for two reasons. *First*, the Court analyzed the issue purely from the perspective of statutory interpretation, and held that "the Board cannot by delegating its authority circumvent the statutory Board quorum requirement, because this requirement must always be satisfied." Laurel Baye, 564 F.3d at 473. *Second*, the Court explained that, under the Restatement (Third) of Agency, "an agent's delegated authority terminates when the powers belonging to the entity that bestowed the authority are suspended." Id. The Court therefore held that the two-member delegee group's "authority to act on behalf of the Board . . . ceased the moment the Board's membership dropped below its quorum requirement of three members." Id.

After Laurel Baye, the Second Circuit considered the 2007 delegation to the two-member delegee group and rejected the D.C. Circuit's analysis and holding. See Snell, 568 F.3d at 410. In Snell, the Second Circuit noted that the relevant statutory provisions should be analyzed pursuant to the framework set forth in Chevron. After finding that the Taft-Hartley Act did not unambiguously resolve the question, the Court turned to the Act's legislative history. Before doing so, however, the Snell Court rejected the D.C. Circuit's reliance on the laws of agency and explained that Second Circuit precedent "require[s] us to turn to legislative history instead of considering related fields of law." Id. at 420. The Court then determined that the legislative history of the Taft-Hartley Act did not precisely answer the question of whether a two-member delegee group could function in the absence of a quorum on the Board. Id. at 423. The Snell Court therefore moved to the final Chevron step and held that the N.L.R.B.'s interpretation of the

statute was reasonable in light of legislative history showing that "Congress restructured the NLRB to enable it to resolve more disputes, not fewer." Id. at 423-24.

In New Process Steel, 130 S. Ct. at 2635, the Supreme Court resolved the Circuit split over the Board's delegation of authority to the two-member group. Agreeing with the result reached by the D.C. Circuit in Laurel Baye, the Court invalidated the 2007 delegation to the two-member delegee group and vacated Snell. Like the D.C. Circuit, the New Process Steel Court found that the Board's delegation to a two-member group "dramatically undercuts the significance of the Board quorum requirement by allowing its permanent circumvention." 130 S. Ct. at 2641. According to the Court, a delegee group could not "exercise the Board's authority" when the Board itself lacked authority to act. Id. at 2642-643. However, in a footnote, the Court intimated that it had rejected the D.C. Circuit's "equation of a quorum requirement with a membership requirement that must be satisfied or else the power of any entity to which the Board has delegated authority is suspended." Id. at 2643 n.4. In particular, the Court stated that its opinion "does not cast doubt on the prior delegations to nongroup members, such as . . . the general counsel." Id. Notably, the New Process Steel Court had not been asked to consider the validity of a delegation of § 10(j) powers to the General Counsel.

Following New Process Steel, the Eighth, Ninth, and Fifth Circuits each adjudicated challenges to the 2007 delegation of § 10(j) powers to the General Counsel. See Othus v. Whitesell Corp., 639 F.3d 841 (8th Cir. 2011); Frankl, 650 F.3d at 1334; Overstreet, 625 F.3d at 844. All three Circuits upheld the Board's ability to delegate its § 10(j) powers and found that the delegation to the General Counsel survived the Board's loss of a quorum. Addressing the New Process Steel decision, all three Circuits interpreted the Supreme Court's comments in footnote 4 as a rejection of the D.C. Circuit's agency approach. See Overstreet, 625 F.3d at 853

("In light of the Court's pronouncement in New Process Steel, we feel no compulsion to follow Laurel Baye."); Othus, 639 F.3d at 844 ("In light of the Act's framework and the Supreme Court's view of Laurel Baye Healthcare, this court joins the Fifth Circuit in concluding that the delegation survived the loss of a Board quorum."); Frankl, 650 F.3d at 1334 ("New Process Steel instructs that the Act's quorum requirement must be satisfied when the Board is acting directly through its members, but does not need to be satisfied for the Board's earlier exercises and assignments of its authority, made with a proper quorum, to remain valid and in effect.").

I agree with these Circuits' interpretation of New Process Steel. The Supreme Court's decision hinged on the fact that the Board had used the two-member delegee group to perpetuate the Board's own existence through a "Rube Goldberg-style delegation" that allowed the Board to act without a quorum. New Process Steel, 130 S. Ct. at 2641. Notably, the delegation at issue in New Process Steel involved a delegation of the Board's chief adjudicatory function: issuing final orders resolving labor disputes. Although New Process Steel holds that a delegee group of Board members may not continue to exercise "the Board's authority" once the Board loses a quorum, it does not follow that a valid delegation of prosecutorial functions to the General Counsel would become invalid when the Board loses a quorum. Indeed, both the Supreme Court, in New Process Steel, and the Second Circuit, in Snell, disapproved of the D.C. Circuit's argument that principles of agency law dictate that all delegations cease to exist once the Board loses its quorum.

In the instant case, it is undisputed that the Board had a duly-constituted quorum when it delegated its § 10(j) powers to the General Counsel. The delegation of prosecutorial duties to the General Counsel does not perpetuate the Board's existence and therefore does not implicate the primary concerns raised by the New Process Steel Court. Although Congress has structured the

N.L.R.B. such that the General Counsel appears to derive his power to prosecute charges of unfair labor practices from the Board, this structure was created in order to "avoid the cumbersome device of establishing a new independent agency," not because Congress saw the General Counsel's power as completely derivative of the Board's power. Instead, Congress created the post of General Counsel to ensure that certain prosecutorial functions operate without regard to the Board. The General Counsel's validly-delegated power to initiate § 10(j) petitions therefore does not vanish when the Board loses its quorum.[3]

## C. The Constitutional Question

Having determined that the Board's November, 2011, delegation to the General Counsel was valid, this Court will not make any pronouncements on the constitutionality of President Obama's recess appointments to the N.L.R.B. In the interest of judicial restraint, the Supreme Court has counseled that a court should not decide a constitutional question unless the question is absolutely necessary to the court's decision. See Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450, 128 S. Ct. 1184 (2008); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346-47, 56 S. Ct. 466 (1936) (Brandeis, J., concurring). Regardless of whether President Obama's recess appointments to the N.L.R.B. were constitutional, this Court would still find that the instant § 10(j) petition was brought pursuant to validly-exercised powers under the Taft-Hartley Act. The constitutional question thus has no capacity to change this Court's decision to deny Renaissance's motion to dismiss.

This is so because there are only two possible answers to the constitutional question and each answer leads to the conclusion that the § 10(j) petition was validly brought. If the recess

---

[3] Although Renaissance repeatedly notes that the November, 2011, delegation only takes effect once the Board loses its quorum, Renaissance fails to explain the legal significance of this distinction or why this makes the instant delegation "far worse" than the delegation considered by the New Process Steel Court. The delegation at issue in New Process Steel was qualitatively different than the delegation at issue here and raised entirely different concerns.

appointments were constitutional and the Board has a duly-constituted quorum, then the delegation to the General Counsel is presently inoperative and the Board itself had statutory authority to approve the instant petition. If, on the other hand, the recess appointments were unconstitutional, then the Board lacks a quorum and the delegation to the General Counsel is operative. Since petitioner received authorization to initiate this § 10(j) action from both the Board and the General Counsel, pursuant to the N.L.R.B.'s ordinary practice,[4] one of these approvals must have been valid regardless of whether the President's appointments to the Board were constitutional.

Renaissance urges this Court to decide the constitutional issue in order to determine whether this action was brought pursuant to the Board's authority or pursuant to a delegation of the Board's § 10(j) power to the General Counsel. Renaissance advocates against a "belt-and-suspenders" approach and argues that "there is no avoiding the question of which view is correct." To the contrary, the appropriate course is for this Court to avoid expounding on a constitutional issue that has no power to change the outcome of this case.

Renaissance also argues that the constitutional question must be answered because this Court may not issue § 10(j) relief if the President's appointments were unconstitutional. In support of this contention, Renaissance cites to Second Circuit precedent stating that § 10(j) relief may issue only upon a finding of "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals." Kaynard v. Mego Corp., 633

---

[4] In a footnote toward the end of Renaissance's reply memorandum in support of its motion to dismiss, Renaissance argued that, while there is "no reason to look behind Petitioner's representation that the Acting General Counsel independently authorized this 10(j) proceeding," this Court should nevertheless grant Renaissance discovery into "whether that authorization was truly 'independent' and the extent to which the recess appointees . . . influenced the decision." Renaissance was careful to note, however, that it was only requesting this discovery if the Court were to find that the General Counsel's authorization of this proceeding "allows the Court to avoid the recess appointment issue." This is the first time Renaissance has mentioned discovery and it is the first time Renaissance has suggested that the Board has improperly influenced the General Counsel. Renaissance provides no facts to support this suggestion and, in any event, fails to explain how this allegedly improper influence could affect the outcome of its motion to dismiss. The request for discovery is therefore denied.

F.2d 1026, 1033 (2d Cir. 1980) (citing McLeod v. Bus. Mach. & Office Appliance Mechs. Conference Bd., 300 F.2d 237, 242 n.17 (2d Cir. 1962)). In the past, the Second Circuit has been asked to enforce a final order of unfair labor practices that was issued by a two-member Board. In those cases, the Circuit made clear that it could not enforce a final order that the Board issued while it lacked a quorum. See, e.g., NLRB v. Talmadge Park, 608 F.3d 913, 913 (2d Cir. 2010). Renaissance therefore argues that § 10(j) relief is available only if this Court finds that the Board's final order would be issued by a valid quorum.

Although Renaissance has correctly recited the standard for § 10(j) relief, it has misinterpreted the Second Circuit's language. The § 10(j) standard refers to the Second Circuit because district courts within the Second Circuit are bound by its precedents. Since a district court adjudicating a § 10(j) petition must determine whether there is "reasonable cause" to believe that an unfair labor practice has been committed, see Hoffman ex rel. NLRB v. Inn Credible Caterers, Ltd., 247 F.3d 360, 365 (2d Cir. 2001), Second Circuit law should guide the district court in determining whether the set of facts presented by the § 10(j) petition amounts to a violation of the N.L.R.A. If, for example, a § 10(j) petition was based on an application of the N.L.R.A. that was clearly contrary to Second Circuit precedent, a district court would have to deny injunctive relief regardless of whether there was reason to believe that the Board might find an unfair labor practice. This is all that is meant by the reference to the Second Circuit in the § 10(j) standard set forth in Mego.

Certainly, the Mego standard does not instruct a district court to speculate as to the Board's future make-up or whether the General Counsel will attempt to enforce the Board's final order with the Second Circuit. The General Counsel could choose not to seek enforcement of the Board's order with the Second Circuit, and the Board's membership could change between now

and the Board's final adjudication of this case. Particularly, the Senate could confirm the President's recent "recess" appointments and moot Renaissance's constitutional argument. Indeed, it is even conceivable that the parties could resolve their differences, as the Administrative Law Judge urged them to, and the matter would never reach the Circuit. The question of whether the Second Circuit would find the recess appointments unconstitutional is therefore not ripe. See Texas v. United States, 523 U.S. 296, 300, 118 S. Ct. 1257 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (internal quotation marks omitted); Nat'l Ass'n of Manufs. v. NLRB, No. 11-CV-1629, slip op. at 4 (D.D.C. Mar. 2, 2012) (finding a similar constitutional challenge unripe because "[n]either the Court nor the parties know if and when the General Counsel will initiate enforcement actions pursuant to the rule, and we do not know whether the Board will be comprised of recess appointees at that time.").

Lastly, Renaissance avers that this Court's equitable powers simply cannot be invoked to "aid an adjudicative process that necessarily will end without any valid adjudication." Putting aside the issue of whether the Board will "necessarily" consist of recess appointees by the time this case is brought to the Second Circuit for enforcement – because no one can say for sure – Renaissance has conceded that the purpose of an injunction under § 10(j) is to protect the Board's "adjudicatory and remedial authority." The purpose of an injunction issued by this Court would therefore be served regardless of whether the Second Circuit subsequently enforced a final order from the Board.

## II.

Section 10(j) provides that a district court "shall have jurisdiction to grant to the Board . . . temporary relief or restraining order as it deems just and proper." Id. In the Second Circuit, a

two-pronged test is used to determine whether to grant an injunction under § 10(j): "First, the court must find reasonable cause to believe that unfair labor practices have been committed. Second, the court must find that the requested relief is just and proper." Hoffman, 247 F.3d at 364-65.

When factual or legal disputes arise in a § 10(j) proceeding, courts within the Second Circuit are required to give substantial deference to the position of the Regional Director. Courts often intone that § 10(j) relief should be denied only if the court is "'convinced that the NLRB's legal or factual theories are fatally flawed.'" See, e.g., Mattina v. Ardsley Bus. Corp., 711 F. Supp. 2d 314, 319 (S.D.N.Y. 2010) (quoting Silverman v. J.R.L. Food Corp., 196 F.3d 334, 335 (2d Cir. 1999)). With respect to issues of fact, the Regional Director should be "given the benefit of the doubt" and all factual inferences should be drawn in his favor if the inference is "within the range of rationality." Hoffman, 247 F.3d at 365 (internal quotation marks omitted). Disputes over issues of law are also viewed in the Regional Director's favor; "'on questions of law, the Board's view should be sustained unless the court is convinced that it is wrong.'" Id. (quoting Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1051 (2d Cir. 1980)).

Renaissance paints injunctive relief under § 10(j) as an "unusual and extreme remedy" to be used only in "extraordinary" circumstances. Although it is black-letter law that injunctive relief is reserved for extraordinary circumstances, there is limited authority from the Second Circuit supporting this characterization of § 10(j) injunctions. In 1982, the Second Circuit commented on "the extraordinary nature of the injunctive remedy" and noted that § 10(j) injunctions are no exception to that principle. Silverman v. 40-41 Realty Assocs., Inc., 668 F.2d 678, 680 (2d Cir. 1982). The 40-401 Realty Court also stated that injunctive relief is appropriate "when there have been flagrant violations of the Act or there is an overriding need to preserve

the status quo." 40-401 Realty, 668 F.2d at 681-82. Although this language suggests that the

Second Circuit might take a narrow view of § 10(j) injunctions, more recent Second Circuit cases

such as Hoffman and J.R.L. Food Corp. do not mention the supposedly "extraordinary" nature of

§ 10(j) relief and do not appear to hold the N.L.R.B. to as high of a standard as Renaissance

might hope. Judge Block has nicely summarized the difference between the test for injunctive

relief under § 10(j) and the standard formulation for a preliminary injunction:

> Most obviously, "reasonable cause to believe that unfair labor practices have been
> committed" is a more forgiving standard than "likelihood of success on the
> merits." Less obviously, § 160(j) does not impose a more stringent burden for
> obtaining a mandatory (as opposed to prohibitory) injunction. Cf. Tom Doherty
> Assocs. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995) ("[A] mandatory
> injunction should issue only upon a clear showing that the moving party is
> entitled to the relief requested, or where extreme or very serious damage will
> result from a denial of preliminary relief."). Indeed, the relief requested here – an
> order requiring an employer to bargain with a union pending a final determination
> by the NLRB that it is required to do so – is clearly mandatory in nature, but is
> frequently granted without any alteration to the usual § 160(j) standards. See,
> e.g., Inn Credible Caterers, 247 F.3d at 364.

Blyer ex rel. NLRB v. One Stop Kosher Supermarket, Inc., 720 F. Supp. 2d 221, 224-25

(E.D.N.Y. 2010).

## A. Reasonable Cause

The Second Circuit has stressed that a Court may find "reasonable cause" under the first

prong of this test without making an ultimate determination on the merits of the petition. See

Hoffman, 247 F.3d at 365. In fact, the threshold for finding "reasonable cause" is similar to the

threshold for making out a *prima facie* case; courts have held that the petitioner need only "come

forward with evidence 'sufficient to spell out a likelihood of violation.'" Blyer ex rel. NLRB v.

Pratt Towers, Inc., 124 F. Supp. 2d 136, 143 (E.D.N.Y. 2000) (quoting Danielson v. Joint Bd. of

Coat, Suit & Allied Garment Workers' Union, 494 F.2d 1230, 1243 (2d Cir. 1974)).

Petitioner alleges that Renaissance violated sections 8(a)(1), (3), and (5) of the N.L.R.A. According to § 8(a)(1), an employer shall not "interfere with, restrain, or coerce employees in the exercise of the[ir] rights" to self-organize. 29 U.S.C. § 158(a)(1). Under § 8(a)(5), an employer may not "refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Section 8(a)(3) bans "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

Petitioner's chief allegations are that Renaissance engaged in surface bargaining; provided incomplete and misleading financial information to the Union during negotiations; unlawfully conditioned the lockout on ratification of employment terms that are not subject to mandatory bargaining; and unilaterally subcontracted out work that is reserved to the unionized employees under the CBA.

*1. Surface Bargaining*

Under § 8(a)(5), an employer must make bona-fide, good-faith attempts to compromise with its unionized employees. An employer that attends bargaining sessions and goes through the motions of bargaining without making authentic efforts to compromise is said to have engaged in "surface bargaining." See, e.g., Bryant & Stratton Bus. Inst., Inc. v. NLRB, 140 F.3d 169, 182-83 (2d Cir. 1998); NLRB v. Pratt & Whitney Air Craft Div., United Techs., 789 F.2d 121, 136 (2d Cir. 1986).

The Second Circuit has held that an employer engages in surface bargaining when it attends bargaining sessions with no genuine intention to compromise, see Bryant & Stratton, 140 F.3d at 182, or when an employer "chooses one opening position and thereafter refuses to bargain." See Pratt & Whitney, 789 F.2d at 136. Notably, "a rigid single offer coupled with a

specific refusal to consider alternative positions" is suggestive of surface bargaining. Cont'l Ins. Co. v. NLRB, 495 F.2d 44, 47 (2d Cir. 1974).

According to petitioner, Renaissance engaged in surface bargaining by proposing, and subsequently refusing to budge from, draconian demands that would have allowed Renaissance to eviscerate the Union's presence in the workplace. The record demonstrates that nearly all of the provisions of Renaissance's final offer were identical to Renaissance's first offer. Furthermore, these provisions permitted Renaissance to lay off the bargaining-unit employees at will and replace them with subcontractors.

On the other hand, Renaissance argues that these provisions were necessary in order for the business to stay afloat. Renaissance further argues that the Union hampered the bargaining process by continuously demanding wages in line with the RAB agreement. From Renaissance's point of view, since the Union offered no concessions other than a reduction of 10 employees (which Renaissance believes would have had limited economic effect), it was essentially being asked to negotiate with itself. Renaissance was permitted to insist upon "shrewd or tough bargaining positions," NLRB v. Am. Nat'l Ins. Co., 343 U.S. 395, 404, 72 S. Ct. 824 (1952), and the record shows that Renaissance had indicated to the Union that it would not meet for bargaining sessions unless the Union made proposals that would decrease, rather than freeze, Renaissance's operating costs.

However, according to petitioner's version of the facts, Renaissance could have explored the option of a RAB waiver and could have countered the Union's wage-freeze offer by proposing to lighten some of the LBFO's provisions in exchange for reduced wages. Under this reading of the facts, Renaissance's failure to explore the RAB waiver casts a shadow on its earlier negotiating pattern; if Renaissance had attended each bargaining session with a genuine

desire to reach compromise with the Union, it is unlikely that Renaissance would have ended the negotiation at the exact moment that the Union finally conceded. Furthermore, in petitioner's point of view, it was Renaissance that closed the door on the parties' negotiations over reducing the number of bargaining unit employees, even though the Union's proposal would indisputably have lowered Renaissance's operating costs.

It is all a matter of perspective. One could argue that the Union's refusal to make a counter-proposal that included meaningful cuts was just as extreme as Renaissance's request for enormous cuts in the first place. Certainly, the Union negotiators were not in any hurry to present a package of cuts to their membership, as there is little glory in that kind of negotiated result. Neither party wanted to budge much if at all.

In a situation like this, I believe a court is required to defer to the perspective adopted by the N.L.R.B. I admit to not being entirely comfortable with that. I did not get the impression from the oral argument or briefing that the N.L.R.B. had made an in-depth study of which side had the more reasonable perspective. It appeared, rather, to simply adopt the Union's position and dismiss that of Renaissance. My concern is exacerbated by the fact that, as is evident from the discussion in this decision of Renaissance's motion to dismiss, there is a not-so-subtle undercurrent in this case that would suggest that petitioner has been politically compromised, and that the full force of the federal government is effectively being brought to bear in favor of organized labor against this employer; such politicization would be antithetical to the basis for affording deference to what should be the neutral perspective of an administrative agency. Nevertheless, there is certainly a rational basis for petitioner's view on this record, and I therefore conclude that there is evidence "sufficient to spell out a likelihood" that Renaissance

engaged in surface bargaining by continuing to insist on the terms of its initial proposal while rejecting alternative proposals without meaningful consideration. See Hoffman, 247 F.3d at 365.

### 2. Failure to Provide Complete and Accurate Financial Information

"[P]atently improbable justifications for a bargaining position" are suggestive of bad-faith bargaining. Glomac Plastics, Inc. v. NLRB, 592 F.2d 94, 98 (2d Cir. 1979). Good-faith bargaining thus requires that each party base its bargaining position upon "honest claims." NLRB v. Truitt Mfg. Co., 351 U.S. 149, 153, 76 S. Ct. 753 (1956). According to the Supreme Court, an employer that bases a bargaining position on a claim of financial distress is generally required to provide "some sort of proof" that it is truly unable to pay. Id. at 152-53. In Truitt, the Supreme Court attempted to narrow its holding, reiterating that every surface-bargaining case is fact-specific and stating that a union is not entitled to substantiating evidence every time economic inability is raised as an argument against increased wages. See id. at 153-54. But the Truitt case, at the very least, stands for the proposition that "a refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith." Id. at 153.

Under the N.L.R.B.'s interpretation of Truitt, an employer that claims an *inability* to pay a requested wage increase must always substantiate this claim by providing financial information to the union. See Nielsen Lithographing Co., 305 N.L.R.B. 697, 700 (1991), aff'd sub nom Graphic Commc'ns Int'l Union, Local 508 v. NLRB, 977 F.2d 1168 (7th Cir. 1992). The N.L.R.B. distinguishes such employers from employers that simply do not want to pay higher wages because paying such wages would decrease the employer's prospective profitability. See id. Although the Second Circuit has indicated that it favors an even broader reading of Truitt, which would require an employer to disclose financial information any time the employer claims

financial hardship, the Circuit has deemed the Board's reading of <u>Truitt</u> to be reasonable. <u>See</u> <u>Torrington Extend-A-Care Emp. Ass'n v. NLRB</u>, 17 F.3d 580, 589-90 (2d Cir. 1994).

It is undisputed that Renaissance claimed an inability to maintain the wage rates set forth in the parties' expired CBA. In emails between Ploscowe and the Union during early stages of bargaining, Ploscowe stated that Renaissance "may not survive" unless it could make "significant changes in the costs of its operations." Renaissance therefore had a duty to provide financial information to the Union that was sufficiently detailed and complete to give the Union a meaningful understanding of Renaissance's financial position.

The N.L.R.B. has held that a wide variety of materials must be provided by the employer under this duty to substantiate a claim of financial hardship, provided the materials are "necessary for, and relevant to," a union's performance of its duties as collective bargaining representative. <u>TNT Logistics N. Am., Inc.</u>, 344 N.L.R.B. 489, 491 (2005). Although the parties give conflicting accounts of the information that was made available to Reis during the two financial review sessions at Renaissance's offices, the record indicates that this factual dispute comes down to a swearing contest between Reis and two Renaissance employees who were present at the review sessions. According to Reis, the only documents at the review sessions were general ledgers, incomplete payroll records, invoices, and a one-page summary of a tax return. Reis testified that he asked for complete tax returns and Renaissance refused to provide them. Renaissance's employees, on the other hand, testified that Reis did not request tax returns. The employees further testified that complete tax returns for Renaissance and its related entities were nevertheless provided for Reis to review. Renaissance's employees also testified that Reis was provided with records used in the preparation of the tax returns; accounts payable and receivable; rent rolls; and "up to date income and expense records for 2010."

Furthermore, under petitioner's version of the events, Reis was not allowed to make photocopies of the general ledgers or any other document except the four or five pages of unaudited summaries created by Renaissance. The N.LR.B. has taken the position that when records are so voluminous that the information is essentially useless to the union without photocopies, an employer who refuses to allow photocopying exhibits bad faith in violation of § 8(a)(5). See Stella D'Oro Biscuit Co., 355 N.L.R.B. No. 158, at *6-*7 (2010); Abercrombie & Fitch Co., 206 N.L.R.B. 464, 466-467 (1973) (citing United Aircraft Corp., 192 N.L.R.B. 382 (1971)). According to petitioner, the Union was unable to meaningfully assess Renaissance's financial condition without photocopies of tax returns, detailed payroll records, and the general ledgers. A business the size of Renaissance, which by its own calculation has yearly income in excess of $20 million, and yet has chosen not to produce audited financial statements, cannot have its finances properly understood without full access to the company's financial records. Although Renaissance argues that the Union agreed to an *in camera* inspection rather than copies, there are emails in the record in which the Union informed Renaissance that it was not feasible for Reis to undertake this job at Renaissance's offices and requested that Renaissance make photocopies. Deference to petitioner's version of the law and facts therefore leads to the conclusion that Renaissance's refusal to provide photocopies was evidence of bad faith.

According to petitioner, Renaissance also provided the Union with misleading financial summaries. Renaissance has provided a reasonable explanation for each of the discrepancies – for example, Renaissance explains that the $28 million was part of a "1031 exchange" and that the loan modification application gave a prospective estimate of losses, whereas the Statement of Operations listed actual losses. However, petitioner contests the veracity of these excuses.

Once again, it is a matter of perspective. It suffices to note that the efforts the Union undertook to obtain this information were no more herculean than Renaissance's efforts to provide it. Sending in one accountant for two visits totaling seven hours is not a great way to get a handle on a $25 million business with no audited financials. It may well be that the Union did not really want to see this information any more than Renaissance wanted to give it, because if fully digested, Renaissance's financial condition may have compelled Union leadership to present its members with the need to accept cuts.

However, if that was the case, Renaissance allowed itself to be outmaneuvered. It was Renaissance's burden to prove the extent of the cost reductions it needed from the Union, and at the very least, it opened itself up to the unfair labor charge that it now faces. Nothing prevented it from making a copy of the documents and delivering them to the Union's doorstep. True, that would have been expensive, but less expensive than this litigation. Since there is a rational basis for petitioner's view, I again must find reasonable cause to believe that an unfair labor practice occurred.

### 3. Conditioning the Lockout on Ratification

Courts and the N.L.R.B. have interpreted § 8(a)(5) to mandate collective bargaining only over certain critical employment terms, such as rates of pay and hours of employment. See, e.g., NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 349, 78 S. Ct. 718 (1958). With respect to non-mandatory terms, such as ratification, an employer may make proposals while bargaining but may not "insist upon them as a condition to any agreement." Id.; accord In re Pleasantview Nursing Home, Inc., 335 N.L.R.B. 961, 963 (2001). An employer therefore may not condition the end of a lockout on ratification or any other non-mandatory subject of bargaining. However, as the N.L.R.B., the Second Circuit, and the Supreme Court have all

acknowledged, pressing a non-mandatory term amounts to an unfair labor practice only when the

employer has been placed on notice that the non-mandatory term is objectionable to the union

and yet continues to treat the term as an ultimatum. See Borg-Warner Corp., 356 U.S. at 723;

Spentonbush/Red Star Cos. v. NLRB, 106 F.3d 484, 493 (2d Cir. 1997) ("The employer had a

right to present, even repeatedly, a demand concerning a non-mandatory subject of bargaining,

so long as it did not posit the matter *as an ultimatum*." (internal quotation marks omitted)); In re

Pleasantview, 335 N.L.R.B. at 964 (it is unlawful to insist upon a non-mandatory term that the

union has made a "clear and express refusal" to bargain over).

Although the Union rejected the LBFO, and therefore impliedly rejected the ratification

requirement, the Union did not communicate any particular objection to this term until it filed its

charge of unfair labor practice. Furthermore, since the Union had repeatedly rejected the other

terms in the LBFO, Renaissance had no reason to believe that the Union's rejection of the LBFO

included a rebuke of the ratification clause. Ploscowe testified before the ALJ that he never had

any intention of conditioning the lockout on ratification, and that he used the term only because

he "couldn't in [his] mind think that they would ever not take that back to a vote." He explained

that he "didn't care" whether the Union accepted the LBFO by ratification or otherwise and that

the reference to ratification in the LBFO was "not meant to force them to do anything."

Petitioner has not presented any facts to demonstrate that Renaissance was aware of the Union's

objection to this particular term, and indeed, the parties have stipulated that the Union never

raised the issue of ratification with Renaissance before filing the unfair labor practices charge.

The Union's position on this issue strongly compels the conclusion that the charge is no more

than posturing in anticipation of litigation. Petitioner therefore has not come forward with

evidence "sufficient to spell out a likelihood" that Renaissance insisted upon ratification as a

condition for ending the lockout. See Pratt Towers, 124 F. Supp. 2d at 143 (quoting Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union, 494 F.2d 1230, 1243 (2d Cir. 1974)).

### 4. Subcontracting Out Union Work

An employer commits an unfair labor practice under § 8(a)(5) if, "without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment," even when a CBA has expired and the parties are negotiating new terms. Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198, 111 S. Ct. 2215 (1991). This doctrine, which the Supreme Court has referred to as the "unilateral change doctrine," has been applied to most mandatory subjects of bargaining. Id. at 199. For example, the Supreme Court has held that an employer's decision to subcontract positions of the bargaining unit – resulting in termination of the unionized employees – is a mandatory subject of bargaining to which the unilateral change doctrine attaches. See Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 85 S. Ct. 398 (1964). The N.L.R.B. has expressed a broader view of this principle, holding that unilateral subcontracting is impermissible any time it has a "substantial, significant, or material effect on the employees' terms and conditions of employment," Louisiana-Pacific Corp., 312 N.L.R.B. 165, 166 (1993), which includes situations in which the employees are not replaced by the subcontractors but may suffer decreased opportunities for overtime pay. See Acme Die Casting, Div. of Lovejoy Indus., Inc., 315 N.L.R.B. 202, 204 n.1 (1994).

It is undisputed that Renaissance did not bargain to impasse with the Union before using subcontractors to conduct repairs in preparation for the mass dismissal request. According to petitioner, the subcontractors performed certain minor repair work that the CBA designates as bargaining-unit work. Renaissance does not dispute that it subcontracted out minor repair work in order to deal with the mass dismissal requests. Instead, Renaissance argues that this work fell

under a modification made to the CBA in 2008 that allowed Renaissance to temporarily subcontract out "renovation work and major repairs." Renaissance further argues that the subcontracting was necessary to deal with the mass dismissal request, and implies that the Union conceded this by declining to file a grievance over the subcontracting. Renaissance also points out that none of the Union employees were terminated or had their hours reduced as a result of this subcontracting.

If this Court were deciding the merits of this labor dispute, Renaissance's unilateral subcontracting would present yet another close call. On one hand, the mass dismissal requests required Renaissance to fix a huge number of HPD violations in a short period of time and it is conceivable that this task would have been beyond the bargaining unit's capacity. The Union's failure to raise this issue with Renaissance prior to filing the unfair labor practice charge is telling, and again raises a question of whether the Union had a sincere concern over this issue before drafting the charge. However, the parties dispute whether the 2008 modification to the CBA allowed Renaissance to subcontract out this type of work, and since both readings of the CBA are reasonable, this Court is required to defer to petitioner's reading. Petitioner has therefore presented "reasonable cause" to believe that Renaissance's unilateral subcontracting of union work violated § 8(a)(5) of the N.L.R.A.

## B. Just and Proper

The Supreme Court has not articulated a standard for determining when an injunction under § 10(j) is "just and proper." In the Second Circuit, however, an injunction is deemed to be "just and proper" when it is "necessary to prevent irreparable harm or to preserve the status quo." Hoffman, 247 F.3d at 368. Although this standard is meant to "preserve[] traditional equitable principles governing injunctive relief," a court should be mindful to apply this standard in the

context of the N.L.R.A. Id. In other words, "irreparable harm" should be interpreted with regard to the policies of the N.L.R.A., and actions which undermine these policies can constitute irreparable harm. See id. (citing Seeler v. Trading Port, Inc., 517 F.2d 33, 40 (2d Cir. 1975)). For example, the Second Circuit has stated that the N.L.R.B. may prevail on the "just and proper" prong by showing a risk of irreparable harm to "the union's position in the plant, to the adjudicatory machinery of the N.L.R.B., and to the policy of the Act in favor of the free selection of collective bargaining representatives." Id. at 368-69.

An injunction forcing Renaissance to bargain in good faith with the Union and reinstate the locked-out employees is clearly "just and proper" under the Second Circuit's standard. The bargaining-unit employees have been unemployed since the lockout began nearly sixteen months ago. Although the employees received interim health care coverage from the Union, this benefit ran out on January 31, 2012. Affidavits submitted by petitioner demonstrate that multiple locked-out employees have pressing health needs. When employees have lost healthcare as a result of an unlawful lockout, an injunction ending the lockout is "just and proper" to prevent irreparable harm to the employees. See Mattina ex rel. NLRB v. Kingsbridge Heights Rehab., No. 08-CV-6550, 2008 WL 3833949, at *25 (S.D.N.Y. Aug. 14, 2008) (the threat of irreparable harm to employees who have lost health care is "tragically obvious").

Furthermore, many of the locked-out employees reside at Flatbush Gardens and have been unable to make their rent payments. This situation is likely to be exacerbated, as their unemployment benefits expired on February 29, 2012. Although Renaissance has promised not to evict the employees until after the ALJ's decision, Renaissance might proceed with the evictions following the ALJ's decision. It would be difficult, if not impossible, to calculate damages for the time an employee and his family spent homeless; a preliminary injunction is

therefore "just and proper" to prevent the employees from being evicted.  See Blyer ex rel. NLRB v. Jung Sun Laundry Grp. Corp., No. 10-CV-2975, 2010 WL 4722286, at *9 (E.D.N.Y. Nov. 15, 2010).

Finally, a preliminary injunction mandating good-faith bargaining and ending the lockout is "just and proper" in this case to prevent irreparable harm to the Union's position at Renaissance and the locked-out employees' right to bargain collectively.  As affidavits submitted by petitioner establish, the employees' support for the Union during their prolonged period of unemployment has waned.  Fewer and fewer employees are participating on the picket lines or attending Union meetings.  The erosion of support for the Union presents a threat of irreparable harm that justifies injunctive relief.  See Hoffman, 247 F.3d at 368-69.

Renaissance cites Third Circuit precedent for the proposition that "small and intimate" bargaining units are less susceptible to erosion as a result of an employer's unfair labor practice. See Kobell v. Suburban Lines, Inc., 731 F.2d 1076 (3d Cir. 1984).  But the bargaining unit in this case is nearly twice the size of the unit considered by the Third Circuit in Kobell, and the Union's Vice President, Kyle Bragg, has affirmed that the Union has already lost the support of many of the employees.

Renaissance also argues that an injunction ending the lockout is not "just and proper" because it has offered to reinstate the employees under the terms and conditions provided in the LBFO.  But the LBFO gave Renaissance the unilateral right to reduce employees' hours below full-time and stop providing health care; of course, the LBFO also gave Renaissance the unilateral right to simply lay off any number of the bargaining-unit employees.  The LBFO therefore provides cold comfort to this Court's concerns regarding healthcare and homelessness. Furthermore, instituting Renaissance's LBFO would do little to preserve the Union's position

with the bargaining-unit employees pending the administrative proceedings; to the contrary, if the LBFO were instituted, the employees would likely view the Union as completely ineffective.

Petitioner also requests an injunction from this Court barring Renaissance from insisting upon ratification of the LBFO or subcontracting out the unionized employees' work to deal with mass dismissal requests. Neither injunction is warranted here. With respect to ratification, petitioner has not established "reasonable cause" to believe that Renaissance ever insisted on this term to begin with; there is thus no reason to enjoin Renaissance from insisting on the term in the future. This is especially so because Renaissance does not contest petitioner's assertion that conditioning the lockout on ratification would have amounted to an unfair labor practice. With respect to subcontracting, petitioner argues that an injunction is "just and proper" in order to "restore[] the lawful bargaining power between the parties." It is true that an injunction can sometimes be warranted in order to allow the parties to "salvage some of the important bargaining equality that existed before the . . . unfair labor practices were committed." Silverman v. MLB Player Relations Comm., Inc., 880 F. Supp. 246, 259 (S.D.N.Y. 1995). But an injunction forcing Renaissance to reinstate the employees will already have achieved this goal. Even if Renaissance's subcontracting of the work associated with the mass dismissal requests has caused the employees to suffer diminished opportunities for overtime work, petitioner does not assert that this loss of overtime has created any risk of irreparable harm to the employees. A preliminary injunction barring this practice is therefore not warranted at this time.

**C.  Petitioner's Delay**

Renaissance argues that injunctive relief is not warranted in this case because petitioner waited fourteen months from the day the initial charges were filed to petition this Court for temporary relief. Courts generally find that the Regional Director's delay in commencing a §

10(j) action does not undermine the case for injunctive relief. According to the Second Circuit, the Board "does not take lightly the commencement of a § 10(j) action," and it is acceptable for months to pass between the allegedly unfair labor practices and the Regional Director's decision to commence a § 10(j) action. Kaynard v. MMIC, Inc., 734 F.2d 950, 954 (2d Cir. 1984); accord Jung Sun Laundry, 2010 WL 4722286, at *10 ("[I]t is inappropriate to punish employees for the Regional Director's delay . . . . The Court will only consider delay where delay leads to a change in circumstances which affects the appropriateness of the relief requested . . . ." (internal quotation marks and citation omitted)).

The fourteen-month delay in this case appears to be typical in § 10(j) proceedings, and courts have granted § 10(j) injunctions despite even longer delays. See Frankl, 650 F.3d at 1366; Overstreet, 625 F.3d at 857; Muffley, 570 F.3d at 546. Petitioner's delay has not rendered injunctive relief inappropriate or ineffective in this case; indeed, the urgent need for injunctive relief arguably only arose when the employees recently lost their healthcare and unemployment benefits. In any event, none of the factors that justify injunctive relief under the "just and proper" prong are diminished by petitioner's delay. The Court thus will not deny injunctive relief on this basis.

### D. Terms of the Injunction

For the reasons stated above, Renaissance will be enjoined from interfering with the unionized employees' rights to bargain collectively. Renaissance must commence bargaining in good faith with the Union. Renaissance also must reinstate the bargaining-unit employees to their former terms and conditions of employment, except with respect to the employees' wages.

With respect to wages, petitioner has made no showing that it would be "just and proper" for this Court to force Renaissance to resume paying the wages that Renaissance has persistently

contended it cannot afford. Although there is "reasonable cause" to believe that Renaissance did not make a good-faith effort to prove the extent of its financial distress to petitioner, this does not mean that Renaissance's claims were meritless. The record raises questions as to the extent of Renaissance's losses, but there is no evidence in the record that Renaissance is a profitable company or that it can afford to pay the wages petitioner demands. Thus, even though a Regional Director is entitled to "assume facts and draw inferences in favor of the charging party," see Danielson v. Int'l Org. of Masters, Mates & Pilots, AFL-CIO, 521 F.2d 747, 751 (2d Cir. 1975), this Court is not required to defer to the Regional Director's determination when it does not appear to be supported by a reasoned analysis of the facts.

During the bargaining period, the Union's chief negotiator conceded that Renaissance was losing money but continued to demand wage increases in line with the RAB agreement. In an email to Renaissance following tender of the LBFO, the Union argued: "You are well aware of the wage and benefit standards for the residential building service industry in NYC. These standards also apply to many other buildings that may be losing money." This statement exemplifies the Union's indifference toward Renaissance's expressed need to reduce its operating costs. This indifference persisted throughout the months the parties spent bargaining and was displayed by both the Union and petitioner in the instant proceeding. Petitioner has not brought any facts to this Court's attention to support the conclusion that Renaissance is financially capable of paying the wages demanded by the Union. This Court is therefore not required to adopt petitioner's determination that it would be "just and proper" to mandate those wages.

Renaissance continues to strenuously argue that it "may very well cease to exist altogether" if it is mandated pay the wage rates in the CBA. Obviously, the irreparable harm to

the employees that is present in this case would be exacerbated if a preliminary injunction from this Court were to force Renaissance into bankruptcy. Moreover, as Renaissance notes, the purpose of a preliminary injunction under § 10(j) is to prevent hardship to the charging party in order to preserve the Board's power to effect relief, rather than to punish the charged party for the allegedly unfair labor practices.

In determining that the employees should be reinstated at a reduced wage, the Court is fulfilling its obligation to balance the equities between the parties and not create a situation that worsens rather than facilitates a resolution of this acrimonious labor dispute. The one point that is undoubtedly obvious to both the Union and the petitioner in the wake of this case is that the Union's next contract with Renaissance is not going to be as rich as its last contract. If Renaissance is going to stop losing money, it is going to have to cut wages, benefits, or both in its next contract with the Union. Because of that, reinstatement of the expired agreement in unaltered form would constitute a form of windfall to the Union, incentivizing it to rely on this Court's injunction for as long as possible instead of reaching an economically-based agreement with Renaissance. See Mego, 633 F.2d at 1035; One Stop Kosher, 720 F. Supp. 2d at 225. The Court recognizes that an agreement that includes cuts can be a difficult pill for Union leaders to ask members to swallow, and it can be a lot more palatable to take an inflexible position and let the chips fall where they may through an administrative, arbitration, or judicial proceeding. The Court is therefore not going to issue injunctive relief that shifts all of the negotiating leverage to the Union and gives it absolutely no reason to seek expeditious resolution of the dispute.

As noted, petitioner has made no effort to undertake an economic determination of what a fair and equitable interim remedy would be while the ALJ and ultimately the Second Circuit decide the merits of the dispute. It has, instead, reflexively embraced a position of reinstatement

that would continue to cause Renaissance to lose money, while giving the employees more than we all know they are going to get when a new agreement is reached, thus making a resolution of the dispute before the case reaches the Second Circuit considerably less likely. After balancing Renaissance's claims of financial distress with the evidence that Renaissance may have exaggerated the extent of its hardship, I find that a 20% wage reduction on the rates set forth in the CBA is appropriate.

## CONCLUSION

Renaissance's motion to dismiss is denied. The petition for a preliminary injunction is granted in part and denied in part. By separate order, Renaissance will be directed to refrain from interfering with the unionized employees' rights to bargain collectively; to reinstate all employees to their former terms and conditions of employment at a rate of pay that is 20% less than the wages in the CBA; and to commence bargaining in good faith with the Union.

**SO ORDERED.**

s/ BMC

U.S.D.J.

Dated: Brooklyn, New York
       March 27, 2012